**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 14-cv-01243-CMA-KMT(Consolidated for purposes with Civil Action No. 14-cv-1402-CMA-KMT)

UNITED FOOD AND COMMERCIAL WORKERS UNION AND PARTICIPATING FOOD INDUSTRY EMPLOYERS TRI-STATE PENSION FUND, Individually and on behalf of all others similarly situated,

Plaintiff,

   v.

ADVANCED EMISSIONS SOLUTIONS, INC.,
MICHAEL D. DURHAM,
MARK H. MCKINNIES,
C. JEAN BUSTARD,
SHARON M. SJOSTROM,       JURY TRIAL DEMANDED
CHRISTINE B. AMRHEIN
and L. HEATH SAMPSON,

Defendants.           APRIL 20, 2015

---

**LEAD PLAINTIFF'S CONSOLIDATED CLASS ACTION COMPLAINT**

---

| | |
|---|---|
| Nathan Zipperian<br>SHEPHERD, FINKELMAN, MILLER<br> & SHAH, LLP<br>1640 Town Center Circle, Suite 216<br>Weston , FL 33326<br>Telephone: (954) 515-0123<br>Facsimile:  (866) 300-7367<br>Email: nzipperian@sfmslaw.com | James E. Miller<br>Laurie Rubinow<br>SHEPHERD, FINKELMAN, MILLER<br> & SHAH, LLP<br>65 Main Street<br>Chester, CT 06412<br>Telephone: (860) 526-1100<br>Facsimile:   (866) 300-7367<br>Email: jmiller@sfmslaw.com<br>     lrubinow@sfmslaw.com |

## TABLE OF CONTENTS

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.    NATURE OF ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

III.   JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

IV.    THE PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

       A.    Lead Plaintiff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

       B.    Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

             i.     The Company. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

             ii.    The Individual Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

V.     FACTUAL ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

       A.    The Company's Experience With Accounting Irregularities
             Prior To The Class Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

       B.    The Company's False And Misleading Statements Regarding
             Its Financial Conditions Issued During The Class Period. . . . . . . . . . . .  26

             i.     The Company's First Quarter Results For 2011. . . . . . . . . . . . .  28

             ii.    The Company's Second Quarter Results For 2011. . . . . . . . . . .  35

             iii.   The Company's Third Quarter Results For 2011. . . . . . . . . . . . .  42

             iv.    The Company's Annual And Fourth Quarter Results For 2011. .  48

             v.     The Company's First Quarter Results For 2012. . . . . . . . . . . . .  55

             vi.    The Company's Second Quarter Results For 2012. . . . . . . . . . .  61

             vii.   The Company's Third Quarter Results For 2012. . . . . . . . . . . . .  70

viii.    The Company's Annual And Fourth Quarter Results For 2012. . 76

ix.    The Company's First Quarter Results For 2013. . . . . . . . . . . . . . 83

x.    The Company's Second Quarter Results For 2013. . . . . . . . . . . 88

xi.    The Company's Third Quarter Results For 2013.. . . . . . . . . . . . 93

C.    The Truth Slowly Emerges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

VI.    ADDITIONAL FACTS SUPPLEMENTING THE STRONG AND COGENT
INFERENCE OF SCIENTER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

VII.    LOSS CAUSATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

VIII.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE
MARKET.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

IX.    INAPPLICABILITY OF THE SAFE HARBOR.. . . . . . . . . . . . . . . . . . . . . . . . . . . 132

X.    CLASS ACTION ALLEGATIONS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

COUNT I:    VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT
AND RULE 10B-5 AGAINST ADVANCED EMISSIONS,
DURHAM, AND MCKINNIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

COUNT II:    VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
AGAINST THE INDIVIDUAL DEFENDANTS.. . . . . . . . . . . . . . . . . . . . . . 141

JURY DEMAND.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

## I.   **INTRODUCTION**

1.      Lead Plaintiff, the United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund ("UFCW Tri-State" or "Lead Plaintiff"), by and through its undersigned counsel, individually on its own behalf and on behalf of all persons or entities that purchased and/or otherwise acquired the common stock of Advanced Emissions Solutions, Inc. or its predecessor-in-interest, ADA-ES, Inc. (together, "Advanced Emissions," "ADES," or the "Company"), between May 12, 2011 and January 23, 2015, brings this action seeking relief under: (1) Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(b), and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), 7 C.F.R. § 240.10b-5; and (2) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t.

2.      Beginning on at least May 12, 2011, the Company, its former Chief Executive Officer ("CEO"), Director, and President, Michael D. Durham ("Durham"), and its former Chief Financial Officer ("CFO"), Principal Accounting Officer, Senior Vice President, Treasurer, Director and Secretary, Mark H. McKinnies ("McKinnies"), intentionally misrepresented the true state of the Company's financial condition, as well as its financial controls, to the investing public and/or engaged in severely reckless conduct by misleading the investing public and omitting significant, material facts in their public pronouncements to investors regarding the Company's financial condition and financial controls, all to the detriment of the Company's investors.  News of the

Company's accounting and financial problems began to emerge on March 13, 2014, when its auditor for its fiscal year ending December 2013, KPMG LLP ("KPMG"), required the Company to issue a press release disclosing accounting issues pertaining to its recognition of revenue for contracts from its Emission Control ("EC") business segment, one of the Company's three main lines of business.

3.      In the following months, it was revealed, among other things, that the Company's revenue recognition issues extended beyond its fiscal year ending December 31, 2013 because the same problems existed in the Company's financial statements for its fiscal years ending December 31, 2012, and December 31, 2011. But investors only received more fulsome notice of the severe problems and apparent culture of concealment within ADES on January 29, 2015, when KPMG resigned in apparent exasperation and protest over its treatment by the Company and management, including questioning whether ADES management was, in fact, being truthful with KPMG.  KPMG cited, among other things, the Company and its management's persistent refusal to timely cooperate with KPMG's investigation.  In the meantime, shareholder value fell by more than 60% from the time of the first disclosure on March 13, 2014, to KPMG's resignation on January 29, 2015, wiping out in excess of $300 million in shareholder value in less than one year.

4.      To this day, the Company has shockingly failed to release its financial results for its fiscal year ended December 31, 2013 (despite having initially promised to do so by April 1, 2014 -- over one year ago -- at the time that it initially disclosed that its

previously reported financial results for 2013 were false and misleading), revised results for the first three quarters of its 2013 fiscal year, its annual reports for its fiscal years ending December 31, 2012 and December 31, 2011, or any other financial information for the quarters and over a 15 month period subsequent to December 31, 2013. Indeed, the last financial results that the Company filed with the SEC were those submitted by the Company in its SEC Form 10-Q for the third quarter of 2013, which were signed and certified as being truthful by Defendants Durham and McKinnies. ADES has admitted that these financial statements were false and misleading in nature but, nevertheless, they remain uncorrected.  As a result, the Company, which had been listed on NASDAQ since January 2004, after missing several extended deadlines to correct its false and misleading financial statements, was de-listed on March 30, 2015. Since the Company's stock is no longer listed on a national exchange, the Company's common stock currently trades Over-The-Counter ("OTC") on the OTC Pink Tier under the trading symbol ADES.

5.      Lead Plaintiff asserts claims under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Advanced Emissions, Durham and McKinnies, and claims under Section 20(a) of the Exchange Act against C. Jean Bustard ("Bustard"), the Company's former Chief Operating Officer ("COO"); Sharon M. Sjostrom ("Sjostrom"), the Company's Chief Technology Officer ("CTO"); Christine B. Amrhein ("Amrhein"), the Company's Vice President and General Counsel; and L. Heath Sampson ("Sampson"), the Company's current President and CEO, who

replaced Durham in these positions earlier this month and who initially joined Advanced Emissions as its CFO in September, 2014 as McKinnies' replacement; as well as Durham and McKinnies.  Amrhein, Bustard, Durham, McKinnies, Sampson and Sjostrom are referred to herein collectively as the "Individual Defendants" and are referred to herein together with the Company collectively as the "Defendants."

6.      Lead Plaintiff, in support of this Consolidated Class Complaint ("Complaint") and for its claims, alleges the following, upon knowledge as to itself and its own acts and, as to all other matters, based upon the investigation made by and through its counsel, which included the following: (a) review and analysis of filings made by Advanced Emissions and the other Defendants with the SEC; (b) review and analysis of press releases, public statements, news articles, securities analysts' reports, earnings conference call transcripts, and other publications disseminated by or concerning Advanced Emissions; (c) interviews with former employees (identified herein as confidential witnesses) of Advanced Emissions; (d) review of other publicly available information about or pertinent to Advanced Emissions and the allegations in this Complaint; and (e) independent analysis of the above items.  Additional facts supporting the allegations contained herein are known only to Defendants, or are exclusively within their control at this time.  Lead Plaintiff believes that substantial, additional evidential support exists for the allegations set forth in this Complaint that will be revealed after a reasonable opportunity for discovery.

II.    **NATURE OF THE ACTION**

7.     Advanced Emissions is a Delaware holding company based in Highlands Ranch, Colorado, which, through its subsidiaries, provides clean coal technology and associated specialty chemicals primarily for the coal-fueled power plant industry.  The Company represents itself as "a leader in clean coal technology and the associated specialty chemicals, serving the coal-fueled power plant industry" with "proprietary environmental technologies and specialty chemicals [that] enable power plants to enhance existing air pollution control equipment, minimize mercury, $CO_2$ and other emissions, maximize capacity, and improve operating efficiency, to meet the challenges of existing and pending emission control regulations."  The Company has three main operating segments: RC (refined coal), EC (emission control) and CC ($CO_2$ capture research and development).  The Company's sales occur principally throughout the United States.

8.     Beginning on March 13, 2014 through January 29, 2015, as a result of a series of revelations and partial, corrective disclosures, it was revealed that, among other things, the Company materially overstated its revenues and understated its net losses for the first three quarters of its 2013 fiscal year, the entire 2011 fiscal year and the entire 2012 fiscal year.  These revelations also exposed the fact that the Company's financial controls suffered from severe material weaknesses throughout these periods, and that the weaknesses were facilitated and exacerbated by an intentionally fraudulent or, at a minimum, an extremely reckless, unresponsive and indifferent management

team, including the Individual Defendants.

9.      On March 13, 2014, at 9:07 a.m. EST, before the stock market opened for

trading, the Company issued a press release announcing that it was rescheduling its

2013 fourth quarter and year-end news release and conference call because it was

reviewing its accounting practices, "particularly [its] methods of recognizing revenue for

its Emission Control business segment contracts."  Nevertheless, the Company

indicated that it would only request a 15 calendar-day extension from the SEC for its

quarterly and annual report.  As a result, the share price of ADES fell by more than 6%,

on unusually high trading volume from a closing price of $27.115 on March 12, 2014 to

a closing price of $25.45 on March 13, 2014.  On the same date, the NASDAQ US

Benchmark Waste & Disposal Services Total Return Index ("NQUSB2799T"), the

composite of the sector in which the Company operates, increased in value, while other

comparable market indexes and individual stocks increased in value or decreased in

price in immaterial amounts.[1]

10.     On March 18, 2014, the Company filed a notice of late filing with the SEC

with respect to its 2013 annual report, indicating that it would likely reduce its previously

reported revenues by $9 million and increase its net losses by $2 million for the first

three quarters of 2013.  Nevertheless, the Company still stated that it expected it would

file its 2013 annual report by April 1, 2014.  In the same notice, the Company explained

---

[1]ADES underwent a 2:1 stock split on March 17, 2014.  All share prices identified in this
Complaint have been adjusted to post-split values.

in more detail the issue with its EC business segment contracts; the Company's methodology recognized project completion and, thus, accrued revenue based on the labor-hours predicted and expended for a particular project, which, naturally, would ignore the non-labor requirements of a project, among other things, and, therefore, could result in inappropriate recognition of revenue -- which apparently was the case with Advanced Emissions.  As a result, the share price of ADES stock fell by almost an additional 4% on unusually high trading volume from a close of $25.50 on March 17, 2014 to a close of $24.50 on March 19, 2014.  During the same period, the NQUSB2799T increased in value, while other comparable market indexes and individual stocks increased in value or decreased in price in immaterial amounts.

11.     April 1, 2014 came and went but, instead of filing its annual report (*i.e.*, SEC Form 10-K for 2013), the Company announced, on April 8, 2014, that it was still in the process of auditing the internal controls for its financial reporting and that it received a notice of noncompliance from NASDAQ.  Then, on April 24, 2014, the Company announced that its Audit Committee of the Board of Directors ("Audit Committee") had decided that the Company's financial statements for the quarters ended March 31, 2013, June 30, 2013, and September 30, 2013, as previously issued, could not be relied upon.  The previous estimated $9 million reduction in revenue was expanded to $10.8 million, and losses increased to $2.3 million.  That same day, the Company also announced that it appointed Rachel A. Smith ("Smith") as its Chief Accounting Officer, even though McKinnies was still the CFO and Principal Accounting Officer at that point.

As a result, the share price of ADES stock fell almost an additional 5% on unusually high trading volume from a close of $23.85 on April 23, 2014 to a close of $22.66 on April 25, 2014.  During the same period, the NQUSB2799T increased in value, while other comparable market indexes and individual stocks increased in value or decreased in price in immaterial amounts.

12.     In the meantime, members of the Company's accounting team and those involved with the EC segment, the center of the accounting fraud, as discussed fully below, confirmed that the accounting functions and internal controls of Advanced Emissions were in shambles and that the Company had no reliable means to estimate project completion from a labor or total cost perspective and, therefore, the Company's entire system for recognizing revenue was deeply flawed and its financial statements were entirely unreliable and patently false and misleading in nature.  The nature of the flaws in the accounting, internal controls and financial reporting systems at Advanced Emissions were so fundamentally flawed that, within this small Company, the nature and extent of these problems must have been known to senior management, including Durham and McKinnies, unless they were purposefully and recklessly turning a blind eye to the fraudulent accounting that surrounded them.  Given the Company's history of acknowledged, internal control issues, as well as restatement of financial results, any assertion that the Company, Durham and McKinnies were unaware of the securities fraud at issue is highly implausible.

13.     A month later, on May 28, 2014, the Company announced that it had

brought in Taylor Simonton as an Independent Director and member of its Board of Directors ("Board"), who was almost immediately elected as the new Chairman of the Audit Committee.  Richard Swanson, a Director and member of the Audit Committee, who had served as the Chairman of the Audit Committee from July 2006 to June 2014, resigned his position on June 6, 2014.  Then, on July 28, 2014, the Company announced the appointment of two other Independent Directors, Christopher Shackelton and Spencer Wells.

14.    On August 21, 2014, the Company issued a press release announcing that its Audit Committee had concluded that the Company's accounting misrepresentations expanded beyond 2013, and that the annual and quarterly financial statements for the years ended December 31, 2011 and 2012, as previously issued, also could not be relied upon because the statements suffered from the same revenue recognition issues as the 2013 quarterly statements (together, the "EC Revenue Misrepresentations").  As a result, the share price of ADES stock fell in excess of an additional 7% on unusual trading volume from a close of $22.65 on August 20, 2014 to a close of $21.00 on August 21, 2014.  On the same date, the NQUSB2799T increased in value, while other comparable market indexes and individual stocks increased in value or decreased in price in immaterial amounts.

15.    On September 2, 2014, the Company announced the resignation of McKinnies, who, as the Company's CFO, Principal Accounting Officer, Senior Vice President, Treasurer, Director, and Secretary, had been responsible for the Company

and its predecessor entity's financial reporting since 2003.  Soon thereafter, on September 19, 2014, the Company announced the resignation of another C-level executive: Bustard, who had been the COO of the Company and its predecessor entity since 2004.[2]

16.     On January 29, 2015, after the market closed, it became public that KPMG, the "Big Four" auditor firm originally hired to audit the Company's financial statements for its fiscal year ended December 31, 2013 – but which was now re-auditing past financial statements and investigating Advanced Emissions' financial reporting systems – had resigned on January 23, 2015 in protest over, among other things, the actions (and inactions) of the Company's management.  KPMG explained forcefully that it was compelled to resign because of, among other things, the "inappropriate tone at the top," the Company's lack of "timeliness and responsiveness to its requests for information," KPMG's "***inability to determine whether management has made available all financial records and related data***," and, overall and most damningly, KPMG's utter "***inability to rely on management's representations***." (Emphasis added.)  KPMG further revealed that "external legal counsel" was requested to "investigate the accounting errors necessitating the restatements and the related underlying cause(s) of such errors."  As a result, the share price of ADES stock was

---

[2]The highest-level executives in senior management usually have titles beginning with "chief" and are therefore usually called "C-level" or part of the "C-suite." The traditional three such officers are chief executive officer (CEO), chief operations officer (COO), and chief financial officer (CFO). *See* http://www.investopedia.com/terms/c/c-suite.asp

decimated and additionally lost over 50% of its then value in the next two days of

trading on enormous trading volume, falling from a close of $19.81 on January 29, 2015

to a close of $9.40 on February 2, 2015.[3]   During the same period, the NQUSB2799T

declined by only 1.6%, while comparable market indexes and individual stocks

increased in value or decreased in price in immaterial amounts.  To date, the share

price of ADES stock still has not recovered from its close on January 29, 2015 and, to

date, over one year after its initial announcement regarding the admitted

misrepresentations in its previously filed financial statements, amazingly, the Company

still has not filed any current financial statements and, in addition, *still has not*

*corrected its previous financial statements that contained admitted*

*misrepresentations over a period of over three years*.

17.     Through this period, Advanced Emissions' share price correspondingly fell

as the truth slowly emerged and was disclosed to the investing public.  The Company's

share price closed at $27.11 on March 12, 2014, the day prior to the first revelation on

the morning of March 13, 2014.  After a 6% drop on March 13, 2014, to $25.45 on

---

[3]On February 2, 2015, the Company disclosed that, on January 30, 2015, it had received a notification letter from NASDAQ Stock Market LLC ("NASDAQ") indicating that the NASDAQ Listing Qualifications Hearings Panel had determined to delist ADES' shares and that, following the suspension of trading of the Company's common stock on NASDAQ, the shares would begin trading on the OTC Markets, OTC Pink Tier ("Pink Sheets"), under the trading symbol "ADES."  The Company also announced on February 2, 2015 that it intended to complete the restatement of its financial statements for the fiscal years ended December 31, 2011 and 2012 and the first three quarters of 2013 and file its delinquent periodic reports with the SEC as soon as "practicable." Advanced Emissions still has not completed the restatements of its financial statements or filed its delinquent financial reporting.

unusual trading volume following the initial disclosures, the share price continued to decline following subsequent corrective disclosures.  The Company's share price collapsed immediately after KPMG's resignation became public along with the accompanying disclosure by KPMG of the profound issues withing ADES, dropping to $10.61 on January 30, 2015, a steep 46% collapse from its closing price on January 29, 2015.  This was followed by another drop to $9.40 on the next market day, February 2, 2015, which was a 53% decline from its January 29, 2015 price.  Each decline in ADES' share price was material and occurred as a direct and proximate result of corrective disclosures to the market regarding previous false and misleading statements and material omissions in Defendants' communications to the market and investing public.  Overall, shares in Advanced Emissions lost more than 65% of their value from March 12, 2014, to February 2, 2015, reducing shareholder value by in excess of $300 million during that time period.

18.     More recently, on March 2, 2015, Smith, who had served as the Company's Chief Accounting Officer since April 21, 2014, resigned from ADES, the Company's common stock shares were de-listed from the NASDAQ effective on March 30, 2015 and, on April 7, 2015, the Company announced that L. Heath Sampson ("Sampson") had been appointed as President and CEO of the Company replacing Durham, who would retire from Advanced Emissions at the end of April, 2015. Sampson had joined the Company on September 2, 2014 as ADES' CFO and as a replacement for McKinnies, who retired from the Company in connection with

Sampson's appointment.

19.     Based on Advanced Emissions' most recent public statements, which have not been updated in a period of many months, the Company currently estimates that its revenues were overstated by approximately $10.8 million and net losses understated by $2.3 million for the first three quarters of the 2013 fiscal year, but the extent of the misstatements has not been definitively established.  Even though it has been over a year since the revelations regarding false and misleading financial statements and accounting irregularities first emerged, the Company has yet to file corrected financial statements for the first three quarters of the 2013 fiscal year, much less the corrected financial statements for the entire 2011 and 2012 fiscal years.  Indeed, the Company has not even provided any estimates as to its overstated revenues and understated net losses for the entire 2011 and 2012 fiscal years.

20.     The Company's shares were suspended from trading by NASDAQ on February 3, 2015, then officially de-listed on March 30, 2015, because of the Company's failure to comply with NASDAQ rules regarding filing financial statements and holding proxy meetings.

21.     The revelations and corrective disclosures that began on March 13, 2014, and continued through January 31, 2015, also exposed and cemented the complicity in and/or legal responsibility for the misstatements and securities fraud at issue of the Individual Defendants.  In the months following the initial revelations, high-level officers and directors responsible for the Company's financial reporting "resigned" and, as noted

above, KPMG then resigned as Advanced Emissions' auditor in January 2015, citing an inability to obtain timely and accurate information from management, as well as, effectively, an inability to trust the Company's management. Moreover, Lead Plaintiff's independent investigation and interviews with former employees has revealed that the Company and its management has a history and pattern of taking stubbornly aggressive accounting positions and ignoring the need to maintain adequate and rigorous internal controls, including financial controls, while, at all pertinent times, the Company's accounting processes were literally in shambles and that fact was obvious and well known within Advanced Emissions.

22. Taken together, these disclosures and reports confirm that the Company and the Individual Defendants made and/or were responsible for the materially false and/or misleading statements made during the Class Period, defined *infra*, because the Company, Durham, and McKinnies failed to disclose the following: (1) the Company had applied an improper methodology to recognize revenue on its EC Contracts, which resulted in revenue being prematurely recognized by the Company and which fact was apparent to the Company's senior management, based upon the business operations of Advanced Emissions, and made material errors in the accrual of revenues; (2) as a result, the Company's reported revenues and financial results were overstated; (3) as such, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (4) the Company lacked adequate internal and financial controls, which rendered the Company's financial statements

-14-

inherently unreliable; (5) the Company's accounting, internal control and financial reporting systems and functions were disorganized, technologically deficient, understaffed and effectively in a shambles, thereby rendering its financial reporting and statements inherently unreliable and highly suspect, and these facts were known to senior management, including Durham and McKinnies, or, at a minimum, were recklessly disregarded and willfully ignored by these Defendants; and (6) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

23.     Accordingly, Lead Plaintiff seeks redress under the federal securities laws on behalf of itself and other investors in ADES common stock between May 12, 2011 and January 29, 2015 inclusive (the "Class Period") who have suffered losses as a result of the accounting and securities fraud perpetrated and/or facilitated by the Company and the other Defendants.

24.     The Class Period begins on May 12, 2011, when the Company first issued a press release announcing its first quarter results for the quarter ended March 31, 2011, which contained the first material misrepresentations of the Company's financial condition.  The Class Period ends on January 29, 2015, when the Company's now-former auditor, KPMG, resigned in protest over of its inability to conduct a full investigation and effectively confirmed the complicity of the Company and Defendants in compiling and releasing the false and misleading statements to the investing public.

III.   **JURISDICTION AND VENUE**

25.     This action arises from Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78(b) and 78(t)(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

27.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts and conduct complained of herein, including the preparation and dissemination of materially false and misleading information to the investing public, occurred in substantial part in this judicial district. The Company is headquartered in this judicial district, which is the nerve center of the Company's operations.

28.     In connection with the acts and omissions alleged in this Complaint, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

IV.   **THE PARTIES**

   A.   **Lead Plaintiff**

29.     Lead Plaintiff, UFCW Tri-State, is an institutional investor that purchased the publicly-traded common shares of Advanced Emissions during the Class Period as set forth in the Certification previously filed with the Court and incorporated herein by

reference, and has suffered damages as a result of the disclosure of the wrongful acts

of Defendants, as alleged herein.

**B.**   **Defendants**

 **i.**   **The Company**

30.   Advanced Emissions is a Delaware holding company that maintains its

principal executive offices and headquarters at 9135 S. Ridgeline Boulevard, Suite 200,

Highlands Ranch, Colorado.  In its quarterly report for the third quarter of 2013, its last-

filed financial statement, it describes its business as follows:

> The Company is principally engaged in providing environmental
> technologies and specialty chemicals to the coal-burning electric power
> generation industry. The Company generates a substantial part of its
> revenue from the sale of refined coal ("RC"), the sale of Activated Carbon
> Injection ("ACI") and Dry Sorbent Injection ("DSI") systems, contracts
> co-funded by the government and industry and the development and
> lease or sale of equipment for the RC market. The Company's sales occur
> principally throughout the United States.

*   *   *

> The Company serves as the holding entity for a family of companies that
> provide emissions solutions to customers in the power generation and
> other industries. Through its subsidiaries and joint ventures, the Company
> is a leader in clean coal technologies and associated specialty chemicals,
> primarily serving the coal-fueled power plant industry. Our proprietary
> environmental technologies and specialty chemicals enable power and
> coal-fired plants to enhance existing air pollution control equipment,
> minimize mercury and other emissions, maximize capacity and improve
> operating efficiencies to meet the challenges of existing and pending
> emission control regulations. We have three operating segments: RC
> (refined coal), EC (emission control) and CC ($CO_2$ capture research and
> development).

> The RC segment includes revenues from the lease or sale of RC facilities
> and RC sales which approximate the cost of raw coal acquired for RC

-17-

facilities operated for Clean Coal's own account. The EC segment includes revenue from the supply of emissions control systems including activated carbon injection ("ACI") systems to control mercury, dry sorbent injection ("DSI") systems to control SO2, SO3 and HCI and electrostatic precipitator ("ESP") liquid flue gas conditioning systems, the licensing of certain technology and provision of proprietary chemicals and consulting services. The CC segment includes revenue from projects relating to the CO2 capture and control market including projects co-funded by government agencies, such as the DOE and industry supported contracts.

31.     Advanced Emissions operates through its four directly and indirectly wholly-owned subsidiaries: ADA-ES, Inc. ("ADA-ES"), a Colorado corporation; BCSI, LLC ("BCSI"), a Delaware limited liability company; ADA Environmental Solutions, LLC, a Colorado limited liability company; and ADA Intellectual Property, LLC, a Colorado limited liability company.  It also has a joint venture interest in Clean Coal Solutions, LLC.

32.     The Company, in its current iteration, was formed as a result of a re-organization executed on July 1, 2013, whereby a new holding entity was formed and replaced ADA-ES as the publicly-held corporation, with ADA-ES and its subsidiaries becoming subsidiaries of the new entity.  There was no change to the Company's underlying business or management as a result of the reorganization (accordingly, "Company," as referred herein, includes Advanced Emissions and its predecessor, ADA-ES).  Shares in ADA-ES were replaced in a direct 1-for-1 conversion to Advanced Emissions' shares, and ADA-ES's quarterly reports and other SEC filings were adopted by Advanced Emissions and incorporated by the new entity, Advanced Emissions, as its own SEC filings.

-18-

ii.    The Individual Defendants

33.    **Michael D. Durham**: Durham, the Company's CEO and President, as well as one of its Directors, until he was replaced in April, 2015 by Sampson, had served in those positions since ADA-ES became independent in 2003.  He also was the President of ADA-ES while it was still a subsidiary to Earth Sciences, Inc.  Durham has a B.S. in Aerospace Engineering from Pennsylvania State University, an M.S. and Ph.D. in Environmental Engineering from the University of Florida, and an Executive MBA from the University of Denver.  Durham reviewed, approved, and signed certain of the Company's false and misleading SEC filings during the Class Period, as well as certifications that the Company maintained adequate internal financial controls throughout the Class Period.  As detailed herein, as a result of his position and intimate involvement in and knowledge of the Company, Durham had the power to influence and did, in fact, influence and control, both directly and indirectly, the decision-making of the Company with respect to key decisions related to the false and misleading statements and/or material omissions at issue in this case.

34.    **Mark H. McKinnies**: Until his resignation on September 2, 2014, McKinnies was the Company's CFO, Principal Accounting Officer, Senior Vice President, Treasurer, Director, and Secretary.  He was one of the Company's Directors since 1998, the CFO since 2000, and the Secretary since 2003.  McKinnies is a Certified Public Accountant and holds a B.S. in Accounting from the University of Denver.  McKinnies reviewed, approved, and signed certain of the Company's false and

misleading SEC filings during the Class Period, as well as certifications that the Company maintained adequate internal financial controls throughout the Class Period. McKinnies attended monthly project management meetings in which the revenue recognition decisions at issue were made, as well as reviewed and approved.  As detailed herein, as a result of his position and intimate involvement in and knowledge of the Company, McKinnies had the power to influence and did, in fact, influence and control, both directly and indirectly, the decision-making of the Company with respect to key decisions related to the false and misleading statements and/or material omissions at issue in this case.

35.   **C. Jean Bustard**: Until her resignation on September 19, 2014, Bustard was the Company's COO.  She was a co-founder of ADA-ES in 1997, and was appointed to COO in July 2004.  Bustard holds a B.S. in Physics Education from Indiana University and a M.A. in Physics from Indiana State University, and completed the Executive M.B.A. program at the University of Colorado in 2004.  Bustard attended monthly project management meetings in which the revenue recognition decisions at issue were made, as well as reviewed and approved.  As detailed herein, as a result of her position and intimate involvement in and knowledge of the Company, Bustard had the power to influence and did, in fact, influence and control, both directly and indirectly, the decision-making of the Company with respect to key decisions related to the false and misleading statements and/or material omissions at issue in this case.

36.   **Sharon M. Sjostrom**: Sjostrom is the current CTO of the Company.  She

joined the Company in 2003 when it acquired her company, EMC Engineering, LLC, and was promoted to CTO in January 2011.  Sjostrom holds a M.A. in Mechanical Engineering from the California Institute of Technology and an MBA from the University of Denver.  Based on a January 31, 2011 press release, Sjostrom is a high-ranking manager who is "responsible for running the Company's mercury control program" and "initiated ADA's carbon capture program and secured over $20 million in DOE and industry funding."  According to the same press release, Sjostrom also is "responsible for driving commercialization of new emission control technologies in the Company's pipeline," and, therefore, had direct managerial involvement and responsibility in the EC segment.  As detailed herein, as a result of her position and intimate involvement in and knowledge of the Company, Sjostrom had the power to influence and did, in fact, influence and control, both directly and indirectly, the decision-making of the Company with respect to key decisions related to the false and misleading statements and/or material omissions at issue in this case.

37.   **Christine B. Amrhein**: Amrhein is the current Vice President and General Counsel of the Company.  Amrhein earned a Bachelor of Arts from Allegheny College, a Masters of Arts from the University of Exeter, a juris doctor from the University of Pittsburgh and a Certificate from the Executive MBA Program at the Darden Graduate School of Business of the University of Virginia.  She served as ADES' Corporate Counsel beginning in July 2011, and became General Counsel in June 2012.  Amrhein is a self-described corporate generalist with significant experience in, among other

things, corporate governance and compliance, who works closely with Advanced

Emissions' Board of Directors, CEO and Executive Team to execute the strategic

growth plan of the Company, provide legal oversight of the Company's contracting

activities and manage ADES intellectual property assets.  As detailed herein, as a result

of her position and intimate involvement in and knowledge of the Company, Amrhein

had the power to influence and did, in fact, influence and control, both directly and

indirectly, the decision-making of the Company with respect to key decisions related to

the false and misleading statements and/or material omissions at issue in this case.

38.    **L. Heath Sampson**: Sampson is the current President and CEO of the

Company, having first been appointed as Advanced Emissions' CFO in September,

2014 during the Class Period as McKinnies' replacement and having replaced Durham

as President and CEO earlier this month.  Sampson holds a Bachelor of Business

Administration and Masters of Accounting from the University of Denver and is a

Certified Public Accountant.  Sampson served as the Company's CFO during the

months leading up to KPMG's resignation based upon an inability to obtain fulsome and

timely information from the Company's management and KPMG's advice that it could

not rely upon the representations of the Company's management, which would include

Sampson.  As detailed herein, as a result of his position and intimate involvement in

and knowledge of the Company, Sampson had the power to influence and did, in fact,

influence and control, both directly and indirectly, the decision-making of the Company

with respect to key decisions related to the false and misleading statements and/or

material omissions at issue in this case.

## V.   FACTUAL ALLEGATIONS

### A.   The Company's Experience With Accounting Irregularities Prior To The Class Period

39.   The EC Revenue Misrepresentations giving rise to this action were not the first instance in which the Company was found to have had material weaknesses with respect to its internal controls over financial reporting.  In its 10-K filed for its fiscal year ended December 31, 2006, the Company disclosed:

**Evaluation of Disclosure Controls and Procedures**

We conducted an evaluation under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities and Exchange Act of 1934, as amended ("Exchange Act"), means controls and other procedures of a company that are designed to ensure that information required to be disclosed by the company in the reports it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms. Disclosure controls and procedures also include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate, to allow timely decisions regarding required disclosure. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded as of December 31, 2006 that our disclosure controls and procedures were not effective at the reasonable assurance level due to the material weaknesses discussed immediately below.

**Management's Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15(d)-15(f)) and includes those policies and procedures that: (a) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (b) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (c) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Our management assessed our internal control over financial reporting as of December 31, 2006. Management based its assessment on criteria set forth in the framework in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.

A material weakness is a control deficiency, or combination of control deficiencies, that result in more than a remote likelihood that a material misstatement of annual or interim financial statements will not be prevented or detected. Management's assessment concluded that the Company did not maintain effective internal control over financial reporting as of December 31, 2006 as a result of the following identified material weaknesses:

1. The Company did not have a sufficient complement of personnel with appropriate training and experience in generally accepted accounting principles ("GAAP"), or adequate controls over the resolution of GAAP accounting issues.

2. The Company's controls over the collection and recording of accounts payable did not operate effectively.

3. The Company did not maintain adequate controls over the reconciliation of accounts receivable and deferred revenue.

Management's assessment of the effectiveness of our internal control over financial reporting as of December 31, 2006, has been audited by

Hein & Associates LLP, our independent registered public accounting firm, as stated in their report which appears herein.

We anticipate the actions described above and resulting improvements in controls will strengthen our internal control over financial reporting and will, over time, address the related material weaknesses that we identified as of December 31, 2006.  However, because many of the controls in our system of internal controls rely extensively on manual review and approval, the successful operation of these controls for, at least, several quarters may be required prior to management being able to conclude that the material weakness has been remediated.

40.      In its 10-K filing for its fiscal year ended December 31, 2007, the material weaknesses confessed to the previous year and referred to above were all purportedly remedied.  In the meantime though, the Company dismissed its auditor, Hein & Associates, LLP ("Hein"), which had audited the Company's financial reports for its fiscal years ended December 31, 2005 and December 31, 2006.  In the Form 8-K noticing its change in auditors, the Company revealed that it was Hein's audit that pushed the Company to disclose the aforementioned weakness in the 10-K for the fiscal year ended December 31, 2006:

The audit report of Hein addressing management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal control over financial reporting as of December 31, 2006 did not contain an adverse opinion or disclaimer of opinion, and was not qualified or modified as to uncertainty, audit scope or accounting principles, *except that Hein's report indicates that we did not maintain effective internal control over financial reporting as of December 31, 2006 due to the effect of the following material weaknesses:*

*1.      We did not have a sufficient complement of personnel with appropriate training and experience in generally accepted accounting principles ("GAAP"), or adequate controls over the resolution of GAAP accounting issues.*

-25-

> **2.      Our controls over the collection and recording of accounts payable did not operate effectively.**
>
> **3.      We did not maintain adequate controls over the reconciliation of accounts receivable and deferred revenue.** (Emphasis added.)

41.      Hein had also disagreed with the Company's "initial determination that the sale of joint venture units in Clean Coal to NexGen was properly recorded as a divesture where recognition of gain was appropriate."

42.      The Company rewarded Hein's vigilance and integrity by replacing it with an apparently more pliable auditor, Ehrhardt Keefe Steiner & Hottman PC ("EKS&H"), which the Company had engaged for a second opinion after Hein's disagreement regarding the Clean Coal/NexGen accounting treatment.  EKS&H would serve as the Company's auditor for the Company's fiscal years ended December 31, 2007, until it was replaced by KPMG in March 2013, when, during the Company's re-organization, the Company found it necessary or preferable, as detailed below, to engage a "Big Four" accounting firm to cement its legitimacy to secure further funding.

**B.      The Company's False And Misleading Statements Regarding Its Financial Conditions Issued During The Class Period**

43.      GAAP are accounting principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements, *e.g.*, quarterly statements, must also comply with GAAP,

with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. § 210.10-01(a).

44.     As detailed below, throughout the Class Period, the Company, Durham, and McKinnies repeatedly made false and misleading statements regarding the Company's financial conditions in regular press releases, conference calls, and filings with the SEC.  Specifically, the Company, Durham, and McKinnies made false and misleading statements regarding and/or failed to disclose the following: (1) the Company had applied an improper methodology to recognize revenue on its EC Contracts, which resulted in revenue being prematurely recognized by the Company and which fact was apparent to the Company's senior management, based upon the business operations of Advanced Emissions, and made material errors in the accrual of revenues; (2) as a result, the Company's reported revenues and financial results were overstated; (3) as such, the Company's financial statements were not prepared in accordance with GAAP; (4) the Company lacked adequate internal and financial controls, which rendered the Company's financial statements inherently unreliable; (5) the Company's accounting, internal control and financial reporting systems and functions were disorganized, technologically deficient, understaffed and effectively in a shambles, thereby rendering its financial reporting and statements inherently unreliable and highly suspect, and these facts were known to senior management, including Durham and McKinnies, or, at a minimum, were recklessly disregarded and willfully

-27-

ignored by these Defendants; and (6) as a result of the foregoing, the Company's

financial statements were materially false and misleading at all relevant times.

### i.     The Company's First Quarter Results For 2011

45.     On May 12, 2011, the Company issued a press release announcing its

first quarter results for 2011 for the period ended March 31, 2011, which quoted

Durham and stated, in relevant part:

**OVERVIEW OF 2011 FIRST QUARTER RESULTS**

• Total revenues increased 119% to $8.5 million.

• Gross margin was $7.2 million, or 85% of revenues, up from $1.4 million, or 35% of revenues, due to higher margins and revenues associated with Refined Coal.

• Operating income of $1.9 million, compared to an operating loss of $3.6 million in the first quarter of 2010.

• Net loss of $27.5 million, or $3.63 per diluted share, which included a $39.5 million expense related to the interim award in the Norit arbitration as well as associated $1.9 million of non-routine legal expenses, and a non-cash loss of $2.0 million from ADA's equity interest in ADA Carbon Solutions, LLC ("ADA-CS").

• ADA would have reported net income after tax of $1.0 million or $0.14 per diluted share, excluding the above mentioned Norit award, legal expenses, the loss relating to its equity interest in ADA-CS and $14.9 million for the tax effect of such items.

*       *       *

*Emissions Control*

Dr. Durham commented, "In the first quarter of 2011, ACI system sales continued to decline due to the power industry postponing buying decisions until there is visibility on regulations. The revenue decrease in this segment, which was primarily caused by lower ACI sales, was

partially offset by increased consulting revenues as several ADA customers initiated evaluation studies to determine how best to respond to the pending regulations. While we expect consulting services to increase as a percentage of segment revenues as the industry seeks to analyze and evaluate the Utility, Industrial and Cement MACT regulations, overall Emissions Control revenues are expected to remain flat until utilities, cement plants and industrial boiler owners begin procurement of equipment for the new and proposed Federal regulations."

To date, ADA has installed or is in the process of installing 47 ACI systems, and remains active in the bid and proposal process. As of March 31, 2011, ADA had contracts in progress for work related to this segment approximating $2.6 million, and expects to recognize a significant portion of this revenue in 2011, with the balance to be completed and realized in 2012. As a result of the Air Toxics Rule, which should be finalized in November of this year, the market for ACI systems is expected to be between 500-700 systems over the next three years. ADA has been expanding its sales staff as well as its engineering design group and fabrication collaborations to address this market."

He [meaning Durham] continued, "Regarding our exclusive licensing agreement with Arch enabling them to treat Powder River Basin coal at the mine with our Enhanced Coal technology, we recognized $333,000 of the $2.0 million license fee in the first quarter. Under our License Agreement with Arch Coal, we agreed to negotiate and enter into a Supply Agreement under which Arch Coal will also purchase the additives exclusively from us. We expect to negotiate the final terms of the Supply Agreement in the next six months."

46.    That same day, the Company held an earnings conference call regarding the quarterly report, during which McKinnies repeated and made the same false and misleading statements regarding the Company's financial conditions and the EC segment:

Revenues amounted to $8.5 million for the quarter or 119% more than the $3.9 million in revenues we recognized in 2010.

*       *       *

-29-

Revenues from our Emission Control or EC segment decreased by 34% during the first quarter, as revenues from activated carbon injection, ACI, Systems slowed, matching the power industry's wait-and-see attitude to addressing developing regulations. EC revenues contributed $2 million in the first quarter of 2011, as compared to a contribution of $3.1 million in the first quarter of 2010. The revenue decrease in this segment was somewhat offset by increased consulting revenues we had recognized from several customers who have initiated evaluation studies to determine how best they might respond to the expected regulations.

*     *     *

As of March 31st, 2011 we had contracts in progress for work related to our EC segment, totaling approximately $2.6 million and we expect to recognize a significant portion of this revenue in 2011, with the balance to be completed and realized in 2012.

*     *     *

For the first quarter, our net loss was $27.5 million, or $3.63 per diluted share, as compared to a net loss of $2.8 million or $0.39 per diluted share for 2010.

47.    On May 13, 2011, the Company filed its Form 10-Q quarterly report for the period ended March 31, 2011, with the SEC.  The Company's Form 10-Q was signed and certified by Durham and McKinnies, and reaffirmed the Company's financial results previously announced on May 12, 2011.  With respect to the EC segment, the Form 10-Q stated, in relevant part:

*Emission Control*

Revenues in our EC segment totaled $2 million for the quarter ended March 31, 2011, representing a decrease of 34% from the same period in 2010. The amounts reported exclude the work ADA has conducted for Clean Coal, as further described below, which was eliminated in our consolidation. Revenues from the EC segment for the quarter ended March 31, 2011 were comprised of sales of ACI systems and services

(33%), flue gas chemicals and services (20%) and other services (47%), compared to 80%, 3%, and 17%, respectively, for the same period in 2010. For the near term, we expect the consulting services in our EC segment to increase as a percentage of EC revenues as the industry seeks to analyze and evaluate the probable MACT regulations in addition to increased revenues related to our technical breakthrough related to PRB coal. We expect our EC segment revenues related to ACI systems to remain at static levels until such time as utilities, cement plants and industrial boilers start to react to the new and anticipated Federal MACT regulations. We expect overall gross margins for the EC segment for 2011 to be lower than levels achieved in 2010.

Our consulting revenues increased approximately $439,000 during the first quarter of 2011 as compared to the same period in 2010 as we began demonstration and other work related to recent change with the MACT regulations and includes revenue from our Arch Coal non-refundable license. Our consulting revenues contributed approximately $941,000 during the first quarter of 2011 and we expect our consulting revenue to increase as a percentage of EC revenues during 2011 as several customers are seeking advice and evaluation studies on how best to comply with the finalized MACT regulations.

As of March 31, 2011, we had contracts in progress for work related to our EC segment totaling approximately $2.6 million, of which we expect to recognize a significant portion in 2011, with the balance to be completed and realized in 2012. Our ACI systems revenues totaled $653,000 in the quarter ended March 31, 2011, representing a decrease of 73% compared to the same period in 2010. In the EC segment, we performed work related to RC systems provided to Clean Coal valued at $112,000 for the quarter ended March 31, 2011, compared to $528,000 for the same period in 2010, which would otherwise be recognized as revenue but was eliminated in the consolidation of Clean Coal.

Cost of revenues for the EC segment decreased by $986,000 for the first quarter of 2011 compared to the same period in 2010, primarily as a result of the decreased revenue-generating activities from our ACI system sales. Gross margin for the EC segment was 59% for the first quarter of 2011 compared to 41% for the same period in 2010. The increase in gross margin from the prior year was primarily a result of cost savings from original budgeted amounts when the contracts commenced.

EC segment profits decreased by $194,000 or 21% for the quarter ended

March 31, 2011 compared to the same period in 2010. The decrease was primarily a result of decreased ACI systems sales.

48.     The Form 10-Q stated that the "accompanying unaudited interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles for interim financial statements and with the instructions to Form 10-Q and Article 10 of Regulation S-X....  The Company prepares its consolidated financial statements in conformity with U.S. generally accepted accounting principles."

49.     Regarding the Company's internal controls over financial reporting, the Form 10-Q stated in relevant part:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation and under supervision of our Chief Executive Officer and Chief Financial Officer, have reviewed and evaluated the effectiveness of the Company's disclosure controls and procedures as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e), as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on their review and evaluation, ***the Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are adequate and effective to ensure that material information related to our financial statements are made known to them by others in a timely manner, particularly during the period in which this quarterly report on Form 10-Q was being prepared, and that no changes are required at this time***.

**Changes in Internal Control Over Financial Reporting**

There were no changes in our internal controls over financial reporting during the quarter ended March 31, 2011, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.  (Emphasis added.)

50.     The Form 10-Q for the first quarter of 2011 ended March 31, 2011,

contained required Sarbanes-Oxley certifications, which were signed by Durham and

McKinnies, who individually certified:

1. I have reviewed this Quarterly Report on Form 10-Q of ADA-ES, Inc.;

2. Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;

3. Based on my knowledge, *the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report*;

4. *The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures* (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, *to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities*, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, *to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;

-33-

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting. (Emphasis added.)

51.    These statements made by the Company, Durham, and McKinnies regarding the Company's results for the quarter ended March 31, 2011, were materially false and misleading because they failed to disclose or indicate the following: (1) the Company had applied an improper methodology to recognize revenue on its EC Contracts, which resulted in revenue being prematurely recognized by the Company and which fact was apparent to the Company's senior management, based upon the business operations of Advanced Emissions, and made material errors in the accrual of

revenues; (2) as a result, the Company's reported revenues and financial results were overstated; (3) as such, the Company's financial statements were not prepared in accordance with GAAP; (4) the Company lacked adequate internal and financial controls, which rendered the Company's financial statements inherently unreliable; (5) the Company's accounting, internal control and financial reporting systems and functions were disorganized, technologically deficient, understaffed and effectively in a shambles, thereby rendering its financial reporting and statements inherently unreliable and highly suspect, and these facts were known to senior management, including Durham and McKinnies, or, at a minimum, were recklessly disregarded and willfully ignored by these Defendants; and (6) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

### ii.   The Company's Second Quarter Results For 2011

52.    On August 11, 2011, the Company issued a press release announcing its second quarter results for 2011 for the period ended June 30, 2011, which quoted Durham and stated, in relevant part:

**SECOND QUARTER 2011 FINANCIAL HIGHLIGHTS**

• Total revenues increased to $7.0 million from $1.9 million in the second quarter of 2010, primarily due to recognition of Refined Coal ("RC") revenues.

• Gross margin was $5.2 million, or 74% of revenues, up from $8,000, or less than 1% of revenues in the second quarter of 2010, due to higher margins and revenues associated with Refined Coal.

• Operating loss narrowed to $2.3 million from an operating loss of $6.7 million in the second quarter of 2010. -

-35-

• Net loss of $2.3 million, or $0.30 per diluted share, included $1.5 million of non-routine legal expenses related to the Norit litigation and a non-cash loss of $1.8 million from ADA's equity interest in ADA Carbon Solutions, LLC ("ADA-CS").

• Cash and cash equivalents increased by $31 million from March 31, 2011.

*     *     *

***Emission Control***

Emission Control revenues increased by 7% to $1.7 million in the second quarter of 2011 from $1.6 million in the comparable quarter in 2010, primarily due to a $603,000 increase in consulting revenues. Dr. Durham went on to say, "Consulting revenues increased in the second quarter as we began demonstration and other work with our utility customers related to recent changes with the MACT regulations. The increase in consulting revenues also includes revenue from our Arch Coal non-refundable license. For the near term, we look for an increase in consulting service revenues as our customers continue to analyze and evaluate the Mercury and Air Toxics Standards proposal ("Air Toxics Rule")."

As of June 30, 2011, ADA had contracts in progress for work related to the emission control segment totaling approximately $2.1 million, of which the Company expects to recognize a significant portion during the second half of 2011, with the balance to be completed and realized in 2012. Activated Carbon Injection ("ACI") system revenues totaled $488,000 in the second quarter of 2011 compared to $1.1 million in the comparable period of 2010. To date, ADA has installed or is in the process of installing 49 ACI systems.

Dr. Durham continued, "We continue to prepare for the implementation of the Air Toxics Rule, due in November 2011, and the resulting expanded market for our ACI systems and other technologies by ramping up our sales team and engineering design group. The Air Toxics Rule alone should increase the demand of ACI systems to 400-700 new systems over the next three years, creating a $500 million market opportunity. In the near term, we expect ACI Systems sales to remain at flat levels until utilities, cement plants and industrial boilers start to place orders in response to these new Federal MACT regulations.

"Regarding our exclusive licensing agreement with Arch which provides ADA with a royalty of up to $1 per ton for the premium Arch receives from sales of the enhanced coal, we recognized $333,000 of the $2.0 million license fee in the second quarter. Our tests have shown that we can enhance PRB coal at the mine, and achieve mercury reductions when the coal is burned at power plants. Additional tests to demonstrate the capabilities of this technology to customers with different plant equipment configurations have been delayed so that we can focus our resources on our Refined Coal systems with the pending year-end deadline. We expect to resume these tests later this year and in 2012 which should provide sufficient time to grow this business as the national mercury control market expands through 2015."

53.     That same day, the Company held an earnings conference call regarding the quarterly report, in which McKinnies repeated the same false and misleading statements regarding the Company's financial conditions and the EC segment:

Revenues amounted to $7 million for the quarter or 263% more than the $1.9 million in revenues we recognized in 2010.

*     *     *

Revenues from our Emission Control, or EC, segment increased 7% to $1.7 million in the second quarter of 2011 as compared to revenues of $1.6 million in the second quarter of 2010. The revenue increase was primarily due to increased consulting revenues we've recognized from several customers who've initiative [sic] evaluation studies to determine how to best respond to the expected regulations.

Sales of our activated and carbon injection systems continue to be slow, indicative of the power industry's wait and see attitude to addressing developing regulations. As of June 30, 2011 we had contracts in progress for work related to our EC segment totaling approximately $2.1 million and we expect to recognize a significant portion of this in 2011 with the balance to be completed and realized in 2012. We believe finalization of the recently announced Mercury and Air Toxics Standard will accelerate and further expand our markets likely starting late this year.

*     *     *

We had DOE contracts including anticipated industry cost share in progress totaling approximately $17.9 million as of June 30, 2011. We expect to recognize approximately $1.6 million of revenue from these contracts in 2011 and the balance through 2014.

\*        \*        \*

For the second quarter our net loss was $2.3 million or $0.30 per diluted share as compared to a net loss of $3.7 million or $0.50 per diluted share in the second quarter of 2010.

54.    On August 12, 2011, the Company filed its Form 10-Q quarterly report for the period ended June 30, 2011, with the SEC.  The Company's Form 10-Q was signed and certified by Durham and McKinnies, and reaffirmed the Company's financial results previously announced on August 11, 2011.  With respect to the EC segment, the Form 10-Q stated, in relevant part:

*Emission Control*

Revenues in our EC segment totaled $1.7 million and $3.7 million for the three and six months ended June 30, 2011, respectively, representing an increase of 7% and a decrease of 20% from the same periods in 2010. The amounts reported exclude the work ADA has conducted for Clean Coal, as further described below, which was eliminated in our consolidation. Revenues from the EC segment for the six months ended June 30, 2011 were comprised of sales of ACI systems and services (30%), flue gas chemicals and services (15%) and other services (55%), compared to 77%, 3%, and 20%, respectively, for the same period in 2010. For the near term, we expect the consulting services in our EC segment to increase as a percentage of EC revenues as the industry seeks to analyze and evaluate the MACT regulations in addition to increased revenues related to our technical breakthrough related to PRB coal. We expect our EC segment revenues related to ACI systems to remain at static levels until such time as utilities, cement plants and industrial boilers start to react to the MACT regulations. We expect overall gross margins for the EC segment for 2011 to be higher than levels achieved in 2010.

-38-

Our consulting revenues increased approximately $603,000 and $1.1 million during the three and six months ended June 30, 2011, respectively, as compared to the same periods in 2010 as we began demonstration and other work related to recent changes with the MACT regulations and includes revenues totaling $333,000 and $667,000, respectively, from our Arch Coal non-refundable license. Our consulting revenues contributed approximately $1.1 million and $1.9 million during the three and six months ended June 30, 2011 and we expect our consulting revenues to increase as a percentage of EC revenues during the remainder of 2011 as several customers are seeking advice and evaluation studies on how best to comply with the finalized MACT regulations.

As of June 30, 2011, we had contracts in progress for work related to our EC segment totaling approximately $2.1 million, of which we expect to recognize a significant portion during the remaining six months of 2011, with the balance to be completed and realized in 2012. Our ACI systems revenues totaled $488,000 and $1.1 million for the three and six months ended June 30, 2011, respectively, representing a decrease of 57% and 68% as compared to the same periods in 2010. In the EC segment, we performed work related to RC systems provided to Clean Coal valued at $359,000 and $471,000 for the three and six months ended June 30, 2011, respectively, that would otherwise be recognized as revenue but were eliminated in the consolidation of Clean Coal. In the EC segment, we performed work related to RC systems provided to Clean Coal valued at $2.7 million and $3.2 million for the three and six months ended June 30, 2010, respectively, that would otherwise be recognized as revenue but were eliminated in the consolidation of Clean Coal. The prior year includes our participation in the construction and installation of the initial RC facilities that were placed in service in at the end of 2009. In the current year, Clean Coal is utilizing a number of additional resources for of the planned new RC facilities.

Cost of revenues for the EC segment decreased by $237,000 and $1.2 million for the three and six months ended June 30, 2011, respectively, from the same periods in 2010, primarily as a result of the decreased revenue-generating activities from our ACI system sales. Gross margins for the EC segment were 44% and 52% for the three and six months ended June 30, 2011, respectively, compared to 25% and 35% for the same periods in 2010. The increase in gross margin from the prior year was primarily a result of cost savings from original budgeted amounts when the contracts commenced.

-39-

EC segment profits increased by $118,000 or 193% and decreased by $76,000 or 8% for the three and six months ended June 30, 2011, respectively, compared to the same periods in 2010. The decrease in the six-month period was primarily a result of decreased ACI system sales.

55.     The Form 10-Q stated that the "accompanying unaudited interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles for interim financial statements and with the instructions to Form 10-Q and Article 10 of Regulation S-X....  The Company prepares its consolidated financial statements in conformity with U.S. generally accepted accounting principles."

56.     The Form 10-Q for the second quarter of 2011 ended June 30, 2011, also contained the required Sarbanes-Oxley certifications substantially similar to the certifications contained in ¶ 50, which were signed and certified by Durham and McKinnies.

57.     Regarding the Company's internal controls over financial reporting, the Form 10-Q stated in relevant part:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation and under supervision of our Chief Executive Officer and Chief Financial Officer, have reviewed and evaluated the effectiveness of the Company's disclosure controls and procedures as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e), as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on their review and evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are adequate and effective to ensure that material information related to our financial statements are made known to them by others in a timely manner, particularly during the period in which this quarterly report on Form 10-Q was being prepared,

and that no changes are required at this time.

**Changes in Internal Control Over Financial Reporting**

There were no changes in our internal controls over financial reporting during the quarter ended June 30, 2011, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

58.    These statements made by the Company, Durham, and McKinnies regarding the Company's results for the quarter ended June 30, 2011, were materially false and misleading because they failed to disclose or indicate the following: (1) the Company had applied an improper methodology to recognize revenue on its EC Contracts, which resulted in revenue being prematurely recognized by the Company and which fact was apparent to the Company's senior management, based upon the business operations of Advanced Emissions, and made material errors in the accrual of revenues; (2) as a result, the Company's reported revenues and financial results were overstated; (3) as such, the Company's financial statements were not prepared in accordance with GAAP; (4) the Company lacked adequate internal and financial controls, which rendered the Company's financial statements inherently unreliable; (5) the Company's accounting, internal control and financial reporting systems and functions were disorganized, technologically deficient, understaffed and effectively in a shambles, thereby rendering its financial reporting and statements inherently unreliable and highly suspect, and these facts were known to senior management, including Durham and McKinnies, or, at a minimum, were recklessly disregarded and willfully ignored by these Defendants; and (6) as a result of the foregoing, the Company's

financial statements were materially false and misleading at all relevant times.

### iii.   The Company's Third Quarter Results For 2011

59.   On November 10, 2011, the Company issued a press release announcing

its third quarter results for 2011 for the period ended September 30, 2011, which

quoted Durham and stated, in relevant part:

**THIRD QUARTER 2011 FINANCIAL HIGHLIGHTS**

• Total revenues increased 76% to $13.2 million from $7.5 million in the third quarter of 2010, primarily due to recognition of Refined Coal ("RC") revenues.

• Gross margin was $7.2 million, or 54% of revenues, compared to $5.8 million, or 78% of revenues, in the third quarter of 2010.

• Operating income improved to $3.5 million from an operating loss of $5.2 million in the third quarter of 2010.

• Net loss narrowed to $3.8 million, or $0.50 per diluted share, from $5.8 million, or $0.78 per diluted share, in third quarter of 2010.

 • The third quarter of 2011 included $193,000 of R&D costs associated with M45 technology, $2.2 million arbitration expenses, and $0.9 million interest expense; there were no such expenses recorded in the third quarter of 2010.

• The third quarter of 2011 included $0.8 million non-routine litigation related legal expenses. The third quarter of 2010 included $8.9 million of non-routine litigation related legal expenses

• Cash and cash equivalents of $9.6 million at September 30, 2011.

*      *      *

***Emission Control***

Emission Control revenues increased by 21% to $3.1 million in the third quarter of 2011 from $2.6 million in the third quarter of 2010, primarily due

to increased consulting work, offset by a decline in Activated Carbon Injection ("ACI") system revenues.

Dr. Durham noted, "Consulting revenues are expected to comprise the greatest percentage of total Emission Control revenues for the final quarter of 2011 as utilities continue to analyze the impact of the Mercury and Air Toxics Standards proposal ("MATS"). As of September 30, 2011, ADA had contracts in progress for work related to the Emission Control segment totaling approximately $3.5 million, up from $2.1 million at June 30, 2011. Of the $3.5 million, ADA expects to recognize approximately 35% of this amount during the fourth quarter of 2011, with the balance to be completed and realized in 2012. ACI system revenues totaled $0.9 million in the third quarter of 2011 compared to $1.2 million in the comparable period of 2010. In the near term, we expect ACI Systems sales to remain static until utilities, cement plants and industrial boilers start to place orders in response to these new Federal MACT regulations. To date, ADA has installed or is in the process of installing ACI systems controlling mercury emissions from 55 coal-fired electric generated unit boilers.

Dr. Durham continued, "The MATS is scheduled to be finalized on December 16, 2011, and we expect that its implementation will expand the market opportunity for ACI systems to approximately $500-600 million, or 400-600 new systems over the next three years. We believe that we are well positioned to capitalize on this opportunity, given our 35% market share of installed / installation-in-progress ACI systems at coal-fired power plants across the country and the network of industry contacts we have developed.

"Regarding our exclusive licensing agreement with Arch Coal which provides ADA with royalties of up to $1 per ton for the premium Arch receives from sales of the enhanced coal, we recognized $333,000 of the $2.0 million license fee in the third quarter. Although we are delaying testing of this technology to customers with different plant equipment configurations in order to focus our resources on our RC systems with the pending year-end deadline, we expect to resume these tests later this year and in 2012. We believe that this schedule provides sufficient time to grow this business as the national mercury control market expands through 2015."

60.     That same day, the Company held an earnings conference call regarding

-43-

the quarterly report, in which McKinnies repeated the same false and misleading

statements regarding the Company's financial conditions and the EC segment:

> Revenues amounted to $13.2 million for the quarter, or 76% more than the $7.5 million in revenues we recognized in 2010.

> \* \* \*

> Revenues from our Emission Control, or EC, segment increased by 21% to $3.1 million in the third quarter 2011, as compared to revenues of $2.6 million in the third quarter of 2010. The revenue increase was primarily due to increased consulting revenues we had recognized from several customers who have initiated evaluation studies to determine how to best respond to the expected regulations. Sales of our activated carbon injection systems continued to be slow, indicative of the power industry's wait-and-see attitude to addressing developing regulations. As of September 30, 2011, we had contracts in progress for work related to our EC segment totaling approximately $3.5 million. We expect to recognize approximately 35% of this amount in the fourth quarter, with the balance to be completed and realized in 2012. We believe finalization of the recently announced Mercury and Air Toxics Standard will accelerate and further expand our markets, likely starting later this year.

> \* \* \*

> For the third quarter, our net loss was $3.8 million, or $0.50 per diluted share, as compared to a net loss of $5.8 million, or $0.78 per diluted share, in third quarter of 2010.

61.     On November 14, 2011, the Company filed its Form 10-Q quarterly report

for the period ended September 30, 2011, with the SEC.  The Company's Form 10-Q

was signed and certified by Durham and McKinnies, and reaffirmed the Company's

financial results previously announced on November 10, 2011.  With respect to the EC

segment, the Form 10-Q stated, in relevant part:

> *Emission Control*

Revenues in our EC segment totaled $3.1 million and $6.8 million for the three and nine months ended September 30, 2011, respectively, representing an increase of 21% and a decrease of 5% from the same periods in 2010. The amounts reported exclude the work ADA has conducted for Clean Coal, as further described below, which was eliminated in our consolidation. Revenues from the EC segment for the nine months ended September 30, 2011 were comprised of sales of ACI systems and services (30%), flue gas chemicals and services (10%) and consulting services (60%), compared to 66%, 5%, and 29%, respectively, for the same period in 2010. For the near term, we expect the consulting services in our EC segment to increase as a percentage of EC revenues as the industry seeks to analyze and evaluate the MATS. We expect our EC segment revenues related to ACI systems to remain at static levels until early 2012 when we expect utilities, cement plants and industrial boilers start to react to the MATS and other MACT regulations. We expect overall gross margins for the EC segment for 2011 to be higher than levels achieved in 2010 due to increased consulting activity.

Our consulting revenues increased $900,000 and $2 million during the three and nine months ended September 30, 2011, respectively, as compared to the same periods in 2010 as we continued demonstration and other work related to recent changes with the MATS and includes revenues totaling $333,000 and $1.1 million, respectively, from our Arch Coal non-refundable license. Our consulting revenues contributed approximately $2.1 million and $4 million during the three and nine months ended September 30, 2011. We expect our consulting revenues to increase as a percentage of EC revenues during the remainder of 2011 as several customers are seeking advice and evaluation studies on how best to comply with the anticipated MATS.

As of September 30, 2011, we had contracts in progress for work related to our EC segment totaling approximately $3.5 million, of which we expect to recognize a significant portion during the remainder of 2011, with the balance to be completed and realized in 2012. Our ACI systems revenues totaled $906,000 and $2 million for the three and nine months ended September 30, 2011, respectively, representing a decrease of 23% and 57% as compared to the same periods in 2010. In the EC segment, we performed work related to RC systems provided to Clean Coal valued at $1 million and $1.5 million for the three and nine months ended September 30, 2011, respectively, as compared to $300,000 and $3.5 million for the three and nine months ended September 30, 2010, respectively. Such work would typically be recognized as revenue but was

eliminated in the consolidation of Clean Coal. The amounts for 2010 include our participation in the construction and installation of the initial RC facilities that were placed in service at the end of 2009. In the current year, Clean Coal is utilizing a number of third-party resources for the new RC facilities currently being constructed and installed.

Cost of revenues for the EC segment increased by $621,000 or 46% and decreased by $602,000 or (14%) for the three and nine months ended September 30, 2011, respectively, from the same periods in 2010, primarily as a result of the decreased year-to date revenue-generating activities and increased current quarter costs related to our ACI system activities including hiring additional staff required for expected growth. Gross margins for the EC segment were 37% and 45% for the three and nine months ended September 30, 2011, respectively, compared to 48% and 40% for the same periods in 2010. The decrease in the gross margin for the quarter compared to last year is a result of the increase in costs related to our ACI systems. The increase in year-to-date gross margin from the prior year was primarily a result of overall cost savings from original budgeted amounts when the contracts commenced.

EC segment profits increased by $45,000 or 6% and decreased by $31,000 or (2%) for the three and nine months ended September 30, 2011, respectively, compared to the same periods in 2010. The decrease in the nine-month period was primarily a result of decreased ACI system sales.

62.     The Form 10-Q stated that the "accompanying unaudited interim

consolidated financial statements have been prepared in accordance with U.S.

generally accepted accounting principles for interim financial statements and with the

instructions to Form 10-Q and Article 10 of Regulation S-X....  The Company prepares

its consolidated financial statements in conformity with U.S. generally accepted

accounting principles."

63.     Regarding the Company's internal controls over financial reporting, the

Form 10-Q stated in relevant part:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation and under supervision of our Chief Executive Officer and Chief Financial Officer, have reviewed and evaluated the effectiveness of the Company's disclosure controls and procedures as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e), as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on their review and evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are adequate and effective to ensure that material information related to our financial statements are made known to them by others in a timely manner, particularly during the period in which this quarterly report on Form 10-Q was being prepared, and that no changes are required at this time.

**Changes in Internal Control Over Financial Reporting**

There were no changes in our internal controls over financial reporting during the quarter ended June 30, 2011 [*sic*], that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

64.    The Form 10-Q for the third quarter of 2011 ended September 30, 2011, also contained the required Sarbanes-Oxley certifications substantially similar to the certifications contained in ¶ 50, which were signed and certified by Durham and McKinnies.

65.    These statements made by the Company, Durham and McKinnies regarding the Company's results for the quarter ended September 30, 2011, were materially false and misleading because they failed to disclose or indicate the following: (1) the Company had applied an improper methodology to recognize revenue on its EC Contracts, which resulted in revenue being prematurely recognized by the Company and which fact was apparent to the Company's senior management, based upon the

business operations of Advanced Emissions, and made material errors in the accrual of revenues; (2) as a result, the Company's reported revenues and financial results were overstated; (3) as such, the Company's financial statements were not prepared in accordance with GAAP; (4) the Company lacked adequate internal and financial controls, which rendered the Company's financial statements inherently unreliable; (5) the Company's accounting, internal control and financial reporting systems and functions were disorganized, technologically deficient, understaffed and effectively in a shambles, thereby rendering its financial reporting and statements inherently unreliable and highly suspect, and these facts were known to senior management, including Durham and McKinnies, or, at a minimum, were recklessly disregarded and willfully ignored by these Defendants; and (6) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

### iv.   The Company's Annual And Fourth Quarter Results For 2011

66.    On March 13, 2012, the Company issued a press release announcing its annual results for 2011 and its fourth quarter results for the period ended December 31, 2011, which quoted Durham and stated, in relevant part:

**OVERVIEW OF 2011 FOURTH QUARTER RESULTS**

• Total revenues increased 174% to $24.6 million from $9.0 million in the fourth quarter of 2010, primarily due to recognition of Refined Coal ("RC") revenues, including coal sales of $17.4 million recognized during demonstration of new placed-in-service facilities.

• Gross margin was $4.7 million, or 19% of revenue, compared to $6.5 million, or 72% of revenues. Lower margin in 2011 is due to inclusion of coal purchases and sales associated with RC activities. 2011 fourth

quarter gross margin excluding coal sales and purchases was 64%.

• Net income of $13.8 million, or $1.53 per diluted share, compared to a net loss of $3.1 million, or $0.42 per diluted share, in the fourth quarter of 2010. The 2011 period included a non-cash $20.0 million gain recognized in settlement of an indemnity claim. The 2010 period included $8.3 million of non-routine legal expenses and a $6.1 million gain from settlement of litigation.

## OVERVIEW OF 2011 RESULTS

• Total revenues increased 139% to $53.3 million.

• Gross margin of $24.4 million, or 46% of revenues, compared to $13.7 million, or 61% of revenues. 2011 gross margin excluding coal sales and purchases was 73%.

• Net loss of $19.9 million, or $2.48 per diluted share, compared to a net loss of $15.5 million, or $2.09 per diluted share in 2010.

*     *     *

## Emission Control

EC revenues increased by 20% to $3.1 million in the fourth quarter of 2011 from $2.6 million in the fourth quarter of 2010, primarily due to increased consulting and equipment sales.

Dr. Durham noted, "The Mercury and Air Toxics Standards proposal ("MATS") has been published in the Federal Register and will be considered final on April 16th of this year. This legislation is expected to expand the market opportunity for ACI systems to approximately $500-600 million, or 400-600 new systems over the next three years. We believe that we are well positioned to capitalize on this opportunity, given our 35% market share of installed / installation-in-progress ACI systems at coal-fired power plants across the country and the network of industry contacts we have developed.

"As of December 31, 2011, ADA had contracts in progress for work related to the EC segment totaling approximately $736,000 compared to $3.5 million at September 30, 2011. ACI system revenues totaled $1.3 million in the fourth quarter of 2011 compared to $791,000 in the

comparable period of 2010. In the near term, we expect ACI and DSI Systems sales to grow, as utilities and other potential customers formulate and act on their approach in response to the new Federal MATS regulation. To date, ADA has installed or is in the process of installing ACI systems controlling mercury emissions from 55 coal-fired electric generated unit boilers.

"Regarding our exclusive licensing agreement with Arch Coal which provides ADA with royalties of up to $1 per ton for the premium Arch receives from sales of the enhanced coal, we recognized $333,000 of the $2.0 million license fee in the fourth quarter."

67.     That same day, the Company held an earnings conference call regarding

the quarterly and annual report, in which McKinnies repeated the same false and

misleading statements regarding the Company's financial conditions and the EC

segment:

Revenue amounted to $24.6 million for the fourth quarter, or 174% more than in 2010; and $53.3 million for the year 2011 as compared to $22.3 million in 2010.

*       *       *

Revenue from our Emission Control, or EC segment, increased 20% during the fourth quarter and 1% for the year, as revenues from Activated Carbon Injection, or ACI systems, were generally slow, matching the power industry's wait-and-see attitude before finalization of the Mercury and Air Toxics Standard, or MATS.

*       *       *

EC revenues contributed $3.1 million in the fourth quarter of 2011 as compared to a contribution of $2.6 million in the fourth quarter of 2010. The revenue increase in this segment was due to increased equipment and consulting revenues. During the fourth quarter, a significant portion of the Company's resources were diverted to our RC priorities that would have otherwise been utilized for current revenue-producing activities.

*       *       *

As of December 31, 2011 we had contracts in progress for work related to our EC segment totaling approximately $736,000, which we expect to recognize as revenue into 2012. We had DOE contracts, including anticipated industry cost share in progress, totaling approximately $15.7 million as of December 31, 2011. We expect to recognize approximately $5.6 million from these contracts in 2012, and the balance through 2014; all dependent on continued DOE funding.

\*      \*      \*

For the fourth quarter, our net income was $13.8 million, or $1.53 per diluted share, as compared to a net loss of $3.1 million, or $0.42 per share for 2010. For the year our net loss was $19.9 million, or $2.48 per diluted share, as compared to a net loss of $15.5 million, or $2.09 per diluted share for 2010.

68.      On March 15, 2012, the Company filed its Form 10-K annual report for its

fiscal year ended December 31, 2011 with the SEC.  The Company's Form 10-K was

signed and certified by Durham and McKinnies, and reaffirmed the Company's financial

results previously announced on March 13, 2012.  With respect to the EC segment, the

Form 10-Q stated, in relevant part:

*Emission Control*

Revenues in our EC segment totaled $10 million in 2011 compared to $9.8 million in 2010, representing an increase of 1%. The amounts reported for 2011 and 2010 excludes the work ADA has conducted for Clean Coal, as further described below, which was eliminated in our consolidation. Revenues from the EC segment for the year ended December 31, 2011 were comprised of sales of ACI systems and services (42%), flue gas chemicals and services (9%) and other services (49%), compared to 56%, 6%, and 38%, respectively, in 2010. For the near term, we expect the consulting services in our EC segment to increase as a percentage of EC revenues as the industry seeks to analyze and evaluate the MATS. We expect our EC segment revenues related to ACI systems to start growing in 2012 when we expect utilities, cement plants and industrial boilers to start reacting to the MATS and other MACT

regulations. We expect overall gross margin dollars for the EC segment for 2012 to be higher than amounts achieved in 2011 due to increased equipment sales and consulting activity.

Our consulting revenues increased $1.3 million during 2011 compared to 2010 as a result of continued demonstrations and other work related to recent changes with the MATS and included revenues totaling $1.3 million from our Arch Coal non-refundable license. Our consulting revenues contributed $4.9 million during 2011 and we expect our consulting revenue to increase for the next year as several customers are seeking advice on how best to comply with the MATS.

As of December 31, 2011, we had contracts in progress for work related to our EC segment totaling $736,000 which we expect to recognize as revenue in 2012. Our ACI systems revenues totaled $4.1 million for 2011, representing a decrease of 25% compared to 2010. In the EC segment, we performed work related to RC systems provided to Clean Coal valued at $8.3 million and $3.7 million for the years ended December 31, 2011 and 2010, respectively, which would otherwise be recognized as revenue but was eliminated in the consolidation of Clean Coal. The amounts for 2010 include our participation in the construction and installation of the initial RC facilities. In 2011, Clean Coal utilized a number of third-party resources to construct and install the new RC facilities. However, we provided services toward the construction and installation of 26 facilities in 2011 as compared to 2 facilities in 2010.

Cost of revenues for the EC segment increased by $732,000 or 12% in 2011 from 2010, primarily as a result of increased costs related to our ACI systems activities including hiring additional staff required for expected growth. Gross margin for the EC segment was 31% for 2011 compared to 38% for 2010. The decrease in gross margin from the prior year is primarily a result of the increase in costs related to our ACI systems.

EC segment profits decreased by $764,000 or 36% for 2011 compared to 2010. The decrease was primarily a result of costs associated with hiring additional staff required for expected growth in future ACI systems sales.

69.    Regarding the Company's internal controls over financial reporting and

adherence to the generally accepted accounting principles, the Form 10-K stated in

relevant part:

> ***Our management is responsible for establishing and maintaining effective internal control over financial reporting***. Internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15(d)-15(f)) ***is defined as a process designed by, or under the supervision of, a company's principal executive and financial officers, or persons performing similar functions, and effected by a company's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with generally acceptable accounting principles and includes those policies and procedures that: (a) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (b) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (c) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements***.

> A material weakness is a control deficiency, or combination of control deficiencies, that result in more than a remote likelihood that a material misstatement of annual or interim financial statements will not be prevented or detected. Our management assessed our internal control over financial reporting as of December 31, 2011. Management based its assessment on criteria set forth in the framework in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on our assessments, we believe that, as of December 31, 2011, our internal control over financial reporting is effective based on those criteria.

*      *      *

> There have been no changes in our internal control over financial reporting during the most recently completed fiscal quarter that have

-53-

materially affected, or are likely to materially affect, our internal control over financial reporting.  (Emphasis added.)

70.    The Form 10-K for the fiscal year ended December 31, 2011, also contained the required Sarbanes-Oxley certifications substantially similar to the certifications contained in ¶ 50, which were signed and certified by Durham and McKinnies.

71.    These statements made by the Company, Durham, and McKinnies regarding the Company's results for the fiscal year ended December 31, 2011, were materially false and misleading because they failed to disclose or indicate the following: (1) the Company had applied an improper methodology to recognize revenue on its EC Contracts, which resulted in revenue being prematurely recognized by the Company and which fact was apparent to the Company's senior management, based upon the business operations of Advanced Emissions, and made material errors in the accrual of revenues; (2) as a result, the Company's reported revenues and financial results were overstated; (3) as such, the Company's financial statements were not prepared in accordance with GAAP; (4) the Company lacked adequate internal and financial controls, which rendered the Company's financial statements inherently unreliable; (5) the Company's accounting, internal control and financial reporting systems and functions were disorganized, technologically deficient, understaffed and effectively in a shambles, thereby rendering its financial reporting and statements inherently unreliable and highly suspect, and these facts were known to senior management, including Durham and McKinnies, or, at a minimum, were recklessly disregarded and willfully

ignored by these Defendants; and (6) as a result of the foregoing, the Company's

financial statements were materially false and misleading at all relevant times.

### v.   The Company's First Quarter Results For 2012

72.     On May 8, 2012, the Company issued a press release announcing its first

quarter results for 2012 for the period ended March 31, 2012, which quoted Durham

and stated, in relevant part:

**OVERVIEW OF 2012 FIRST QUARTER RESULTS**

• Total revenues increased 115% to $18.2 million from $8.5 million in the first quarter of 2011, primarily due to the operations of two Refined Coal ("RC") facilities and RC sales.

• Gross margin was $4.0 million or 22% of revenues for the first quarter of 2012, compared to $7.2 million, or 85% of revenues for the same period in 2011, due to raw coal purchases, operating costs for retained RC production and increased activity in the Emission Control segment.

• Operating loss of $1.2 million for the first quarter of 2012, compared to operating income of $1.9 million for the same period in 2011.

• Net loss of $1.4 million, or $0.14 per diluted share for the first quarter of 2012, compared to a net loss of $27.5 million, or $3.63 per diluted share in the first quarter of 2011, which included litigation settlement costs, legal and other expenses totaling, before tax, approximately $41.4 million.

• Cash and cash equivalents of $28.3 million at March 31, 2012.

...

*Emission Control*

EC revenues increased by 36% to $2.8 million for the first quarter of 2012 compared to $2.0 million in the same period in 2011.

Dr. Durham noted, "The MATS regulation was finalized on April 16th of this year and we expect our revenues and margins in the EC segment to

grow as utilities, cement plants, and industrial boilers react accordingly. We saw some evidence of this during the 2012 first quarter, when our consulting revenues increased by approximately $489,000 from the same period last year due to MATS-driven demonstrations and other work."

As of March 31, 2012, ADA had contracts in progress for work related to the EC segment totaling approximately $4.6 million, which the Company expects to recognize as revenue during the remainder of 2012. ACI system revenues totaled $1.4 million in the first quarter of 2012 compared to $948,000 in the comparable period of 2011.

Dr. Durham continued, "For the remainder of 2012, we expect ACI and DSI Systems sales to increase, as current and potential customers begin to finalize their approach to become compliant with the new Federal MATS regulation. As an indication of progress in the development of this market, to date we have responded to greater than $130 million in bids for equipment and $6 million in bids for testing services. We anticipate that some of these contracts could be awarded as early as the second quarter.

Our Enhanced Coal technology is a third ADA mercury-only coal treatment technology being marketed by the Company to meet mercury requirements which currently exist in 19 states and will require implementation by 2015 due to MATS requirements. We believe this Enhanced Coal technology provides a benefit to the customer of $1-$4 per ton of coal burned when used on Western coals. U.S. power plants consume up to 600 million tons of Western coal per year. This year we are planning several demonstrations of the technology both at the mine and at specific power plants."

73.     That same day, the Company held an earnings conference call regarding the quarterly report, in which McKinnies repeated the same false and misleading statements regarding the Company's financial conditions and the EC segment:

Revenues amounted to $18.2 million for the first quarter as compared to $8.5 million in the 2011, as [sic] an increase of 115%. The increase for the quarter due to increases in both our Refined Coal, or RC, and Emission Control, or EC, segments.

\*        \*        \*

-56-

Revenues from our Emission Control, or EC, segment increased 36% during the quarter. Although bid and proposal activity has increased significantly, revenues from Activated Carbon Injection, or ACI systems, were generally slow, as expected contract awards from the finalization of the Mercury and Air Toxics Standards, or MATS, are still on the horizon.

EC revenues contributed $2.8 million for the quarter as compared to a contribution of $2 million in 2011. The revenue increase in this segment was primarily due to increased consulting revenues of approximately $489,000 from the same period in 2011 due to MATS-driven demonstrations and other work.

\*       \*       \*

As of March 31, 2012, we had contracts in progress for work related to our EC segment totaling approximately $4.6 million, all of which we expect to recognize as revenue this year. We had DOE contracts including anticipated industry cost-share in progress totaling approximately $15.4 million as of March 31, 2012. We expect to recognize approximately $5.3 million from these contracts during the remainder of this year, with the balance through 2014, all of which is dependent on continued DOE funding.

\*       \*       \*

Margins realized in our EC segment of 25% for the first quarter of 2012 are in line with expectations for the year.

\*       \*       \*

For the first quarter of 2012, our net loss was $1.4 million or $0.14 per basic and diluted share as compared to a net loss of $27.5 million or $3.63 per share for 2011.

74.     On May 10, 2012, the Company filed its Form 10-Q quarterly report for the period ended March 31, 2012, with the SEC.  The Company's Form 10-Q was signed and certified by Durham and McKinnies, and reaffirmed the Company's financial results previously announced on May 8, 2012.  With respect to the EC segment, the Form 10-

Q stated, in relevant part:

*Emission Control*

Revenues in our EC segment totaled $2.8 million for the quarter ended March 31, 2012 compared to $2 million for the same period in 2011, representing an increase of 36% from the same period in 2011.

The amounts reported excludes the work ADA has conducted for Clean Coal, as further described below, which was eliminated in our consolidation. Revenues from the EC segment for the quarter ended March 31, 2012 were comprised of sales of ACI and DSI systems and services (51%), consulting and demonstration services (41%) and flue gas chemicals and services (8%) compared to 47%, 32%, and 21%, respectively, for the same period in 2011. For the near term, we expect the consulting services in our EC segment to increase as a percentage of EC revenues as the industry seeks to analyze and evaluate the MATS. We expect our EC segment revenues related to ACI and DSI systems to start growing later in 2012 when we expect utilities, cement plants and industrial boilers to start reacting to the MATS and other MACT regulations. We expect our gross margin percentage for our EC segment for 2012 to be similar to the 25% recognized in the first quarter.

Our consulting revenues totaled $1.1 million for the quarter ended March 31, 2012 compared to $646,000 for the same period in 2011, representing an increase of 76% from the same period in 2011 as we continued demonstrations and other work related to recent changes with the MATS. Our consulting revenues contributed $1.1 million during the first quarter of 2012 and we expect our consulting revenue to increase as a percentage of EC revenues during 2012 as several customers are seeking on how best to comply with the MATS.

As of March 31, 2012, we had contracts in progress for work related to our EC segment totaling approximately $4.6 million, which we expect to recognize in 2012. Our ACI systems revenues totaled $1.4 million for the quarter ended March 31, 2012, representing an increase of 43% compared to the same period in 2011. In the EC segment, we performed work related to RC systems provided to Clean Coal valued at $1.4 million for the quarter ended March 31, 2012, compared to $112,000 for the same period in 2011, which would otherwise be recognized as revenue but was eliminated in the consolidation of Clean Coal.

Cost of revenues for the EC segment increased by $1.2 million for the first quarter of 2012 compared to the same period in 2011, primarily as a result of the increased revenue-generating activities from our ACI system sales. Gross margin for the EC segment was 25% for the first quarter of 2012 compared to 59% for the same period in 2011. The decrease in gross margin from the prior year was primarily a result of increased costs related to our ACI systems activities including hiring additional staff required for expected growth.

EC segment profits decreased by $661,000 or 90% for the quarter ended March 31, 2012 compared to the same period in 2011. The decrease was primarily a result of lower margins and hiring of additional staff for expected growth as discussed above.

75.     Regarding the Company's internal controls over financial reporting, the

Form 10-Q stated in relevant part:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation and under supervision of our Chief Executive Officer and Chief Financial Officer, have reviewed and evaluated the effectiveness of the Company's disclosure controls and procedures as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e), as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on their review and evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective to ensure that material information related to our financial statements are made known to them by others in a timely manner, particularly during the period in which this quarterly report on Form 10-Q was being prepared, and that no changes are required at this time.

**Changes in Internal Control Over Financial Reporting**

There were no changes in our internal controls over financial reporting during the quarter ended March 31, 2012, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

76.     The Form 10-Q for the first quarter of 2012 ended March 31, 2012, also

contained the required Sarbanes-Oxley certifications substantially similar to the certifications contained in ¶ 50, which were signed and certified by Durham and McKinnies.

77.    These statements made by the Company, Durham, and McKinnies regarding the Company's results for the quarter ended March 31, 2012, were materially false and misleading because they failed to disclose or indicate the following: (1) the Company had applied an improper methodology to recognize revenue on its EC Contracts, which resulted in revenue being prematurely recognized by the Company and which fact was apparent to the Company's senior management, based upon the business operations of Advanced Emissions, and made material errors in the accrual of revenues; (2) as a result, the Company's reported revenues and financial results were overstated; (3) as such, the Company's financial statements were not prepared in accordance with GAAP; (4) the Company lacked adequate internal and financial controls, which rendered the Company's financial statements inherently unreliable; (5) the Company's accounting, internal control and financial reporting systems and functions were disorganized, technologically deficient, understaffed and effectively in a shambles, thereby rendering its financial reporting and statements inherently unreliable and highly suspect, and these facts were known to senior management, including Durham and McKinnies, or, at a minimum, were recklessly disregarded and willfully ignored by these Defendants; and (6) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

### vi.    The Company's Second Quarter Results For 2012

78.    On August 7, 2012, the Company issued a press release announcing its second quarter results for 2012 for the period ended June 30, 2012, which quoted Durham and stated, in relevant part:

**OVERVIEW OF 2012 SECOND QUARTER RESULTS**

• Total revenues increased to $52.5 million from $7.0 million in the second quarter of 2011, primarily due to the operations at 7 Refined Coal ("RC") facilities and RC sales from the 4 facilities operated for our own account.

• Gross margin was $7.4 million, or 14% of revenues, compared to $5.2 million, or 74% of revenues for the same period in 2011, due to the impact of RC coal sales and raw coal purchases in the 2012 second quarter. Excluding the impact of RC coal sales and raw coal purchases from the 4 RC facilities operated for our own account, gross margin in the second quarter of 2012 was 81%.

• Operating income was $1.6 million, compared to an operating loss of $2.3 million for the second quarter of 2011.

• Pre-tax income from continuing operations improved to $0.9 million from a loss of $2.5 million in the second quarter of 2011.

• Net loss was $2.6 million, or $0.26 per diluted share, and included:

• $0.9 million in interest expense and royalty payments

• $1.3 million in income tax expense based on the estimated effective income tax rate for 2012

• $2.2 million deduction for non-controlling interests

• Clean Coal Solutions, LLC ("Clean Coal") generated $7.5 million in tax credits from the operations of four RC facilities.

• Cash and cash equivalents were $23.1 million at June 30, 2012.

\*        \*        \*

*Emissions Control*

EC revenues increased by 132% to $4.0 million for the second quarter of 2012 from $1.7 million in last year's second quarter, driven by higher sales of Activated Carbon Injection ("ACI") and Dry Sorbent Injection ("DSI") systems, as well as an increase in consulting fees.

Dr. Durham stated, "Sales of ACI and DSI systems are expected to generate more than $300 million in revenues for ADA over the next three years, driven by the U.S. Environmental Protection Agency's Mercury and Air Toxics Standard ("MATS") that mandates reductions in acid gas emissions at coal-fired power plants around the country. ADA has traditionally been a market leader in ACI systems, holding a 35% market share and we expect to maintain this share of the market for the new systems that will be required by the MATS."

"As previously announced, ADA, through a wholly owned subsidiary, has agreed to acquire and operate the assets of Bulk Conveyor Specialist Inc., a leading privately held fabricator and supplier of DSI systems and other material handling equipment, and Bulk Conveyor Services, Inc., which provides testing and related services (collectively, "BCSI"). BCSI's manufacturing facility will allow ADA to vertically integrate portions of its equipment supply business, expand its capacity for supplying ACI systems, and further advance its patent-pending DSI process by marrying it with BCSI's successful, proven design. The transaction is expected to close near the end of August 2012, subject to customary and certain other conditions.

Dr. Durham continued, "As of June 30, 2012, we had contracts in progress for work related to the EC segment totaling approximately $4.5 million, which we expect to recognize as revenue during the remainder of 2012. We expect that the ACI and DSI Systems market will continue to grow and evolve as utilities respond to the MATS. To date ADA has responded to greater than $160 million in bids for equipment of which $94 million is from this calendar year alone.

"The MATS is also supporting a developing market for ADA's Enhanced Coal technology, a mercury-only coal treatment to meet mercury requirements which currently exist in 19 states and will require implementation by 2015 due to the MATS. We believe this Enhanced Coal technology provides a benefit to the customer of $1-$4 per ton of

coal burned when used on Western coals, because of the lower cost of Enhanced Coal to the customer versus traditional emission control options. U.S. power plants consume up to 600 million tons of Western coal per year. This year we are planning several demonstrations of the technology both at the mine and at specific power plants."

79.     That same day, the Company held an earnings conference call regarding the quarterly report, in which McKinnies repeated the same false and misleading statements regarding the Company's financial conditions and the EC segment:

> Revenues amounted to $52.5 million for the second quarter as compared to $7 million in 2011, an increase of over 600%. The increase for the quarter is due primarily to increases in our Refined Coal or RC segment, but we also reported increases in our Emissions Control or EC segment. RC revenues are reported from the consolidation of Clean Coal Solutions, LLC, Clean Coal, our joint venture with NexGen Resources, an affiliate of the Goldman Sachs Group Inc.
>
> *        *        *
>
> Revenues from our Emissions Control or EC segment increased 132% during the quarter. Although bid and proposal activity has increased significantly, revenues from activated carbon injection, ACI systems were generally slow as expected contract awards from the finalization of the Mercury and Air Toxic Standards or MATS rules are still on the horizon.
>
> EC's revenues contributed $4 million for the quarter as compared to a contribution of $1.7 million in 2011. The revenue increase in this segment was due to increased revenues in both equipment sales and consulting services. Revenues from our carbon capture or CC segment generated from our DoD and industry-supported $CO_2$ development demonstration contracts decreased from $569,000 in the second quarter of 2011 to $195,000 for the current quarter.
>
> During the quarter, we commenced work on the fabrication and construction phase of our $20.5 million $CO_2$ capture plant project, the contract for which was previously announced in the fourth quarter of 2010. We expect the project to provide significant revenues for the Company through 2014.

We are also responding to increased procurement activities for both our ACI and dry sorbent injection or DSI systems as a result of the recently finalized MATS and we expect significant increases in revenues from equipment sales materializing later this year for the next several years as most utilities will need to be in compliance by 2015.

As of June 30, 2012, we had contracts in progress for work related to our EC segment totaling approximately $4.5 million, which we expect to recognize as revenue this year. We had DOE contracts, including anticipating industry cost share in progress totaling approximately $15.2 million as of June 30, 2012. We expect to recognize approximately $5.1 million from these contracts during the remainder of 2012 and the balance through 2014, all of which is dependent on continuing DOE funding.

\*     \*     \*

Margins realized in our EC segment of 23% for the first half of 2012 are in line with expectations for the year

\*     \*     \*

For the second quarter of 2012, our net loss was $2.6 million, or $0.26 per basic and diluted share, as compared to a net loss of $2.3 million, or $0.30 per share, for 2011.

80.     On August 9, 2012, the Company filed its Form 10-Q quarterly report for the period ended June 30, 2012, with the SEC.  The Company's Form 10-Q was signed and certified by Durham and McKinnies, and reaffirmed the Company's financial results previously announced on August 7, 2012.  With respect to the EC segment, the Form 10-Q stated, in relevant part:

*Emission Control*

Revenues in our EC segment totaled $4.0 million and $6.7 million for the three and six months ended June 30, 2012, respectively, compared to $1.7 million and $3.7 million for the three and six months ended June 30, 2011, respectively, representing an increase of 132% and 80% for the

quarter and year to date.

The amounts reported excludes the work ADA has conducted for Clean Coal, as further described below, which was eliminated in our consolidation. Revenues from the EC segment for the six months ended June 30, 2012 were comprised of sales of ACI and DSI systems and services (62%), consulting and demonstration services (32%) and flue gas chemicals and services (6%) compared to 30%, 53%, and 17%, respectively, for the same period in 2011. For the near term, we expect the consulting services in our EC segment to increase as a percentage of EC revenues as the industry continues to analyze and evaluate the MATS. We expect our EC segment revenues related to ACI and DSI systems to start growing later in 2012 when we expect utilities, cement plants and industrial boilers to start placing orders due to the MATS and other MACT regulations. We expect our gross margin percentage for our EC segment for 2012 will approximate 25%.

Our consulting revenues totaled $1 million and $2.1 million for the three and six months ended June 30, 2012, respectively, compared to $1 million and $2 million for the same periods in 2011, representing an increase of 4% and 12% from the same periods in 2011 as we continued demonstrations and other work related to the recent finalization of the MATS. We expect our consulting revenue to continue to be a significant part of EC revenues during 2012 as several customers are seeking alternatives on how best to comply with the MATS.

As of June 30, 2012, we had contracts in progress for work related to our EC segment totaling approximately $4.5 million, which we expect to recognize in 2012. Our ACI and DSI systems revenues totaled $2.6 million and $4 million for the three and six months ended June 30, 2012, respectively, representing an increase of 463% and 264% compared to the same periods in 2011. In the EC segment, we performed work related to RC facilities provided to Clean Coal valued at $624,000 and $2 million for the three and six months ended June 30, 2012, respectively, compared to $359,000 and $471,000 for the same periods in 2011, which would otherwise be recognized as revenue but was eliminated in the consolidation of Clean Coal.

Cost of revenues for the EC segment increased by $2.1 million and $3.4 million for the three and six months ended June 30, 2012, respectively, compared to the same periods in 2011, primarily as a result of the increased revenue-generating activities from our ACI system sales. Gross

margins for the EC segment were 22% and 23% for the three and six months ended June 30, 2012, respectively, compared to 44% and 52% for the same periods in 2011. The decrease in gross margin from the prior year was primarily a result of increased costs related to our ACI systems activities including hiring additional staff required for expected growth.

EC segment profits decreased by $77,000 or 43% and $783,000 or 81% for the three and six months ended June 30, 2012, respectively, compared to the same periods in 2011. The decrease was primarily a result of lower margins and hiring of additional staff for expected growth as discussed above.

81.     The Form 10-Q also provided that the "accompanying unaudited interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles for interim financial statements and with the instructions to Form 10-Q and Article 10 of Regulation S-X.... The Company prepares its consolidated financial statements in conformity with U.S. generally accepted accounting principles."

82.     Regarding the Company's internal controls over financial reporting, the Form 10-Q stated that there were accounting issues with its equity investment in Clean Coal, but there was no mention of the EC Segment:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation and under supervision of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), has reviewed and evaluated the effectiveness of the Company's disclosure controls and procedures as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e), as of the end of the period covered by this Quarterly Report on Form 10-Q.

Pursuant to Rule 13a-15(b) under the Securities and Exchange Act of 1934 ("Exchange Act"), the Company carried out an evaluation, with the participation of the Company's management, including the Company's

CEO and CFO (the Company's principal financial and accounting officer), of the effectiveness of the Company's disclosure controls and procedures (as defined under Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on that evaluation, and taking the matters described below into account, the Company's CEO and CFO have concluded that our disclosure controls and procedures were effective during the reporting period ended June 30, 2012.

*On June 20, 2012, management concluded, after consultation with the Board of Directors and Audit Committee that the Company had not properly accounted for the equity investment in Clean Coal that has been held by an affiliate of GS since May 2011. This error had a material effect on our previously issued consolidated financial statements for the year ended December 31, 2011 and the quarters ended June 30, 2011, September 30, 2011 and March 31, 2012, which is requiring us to restate the financial statements for such periods*.

In conjunction with the matter described above, management has re-evaluated its previously provided assessments as of June 30, 2011, September 30, 2011, December 31, 2011, and March 31, 2012 regarding *the effectiveness of the Company's disclosure controls and procedures and determined that as of these periods, the disclosure controls and procedures were not effective and included a Material Weakness as described below*. Company management has determined that this Material Weakness in Internal Control Over Financial Reporting has been remediated as of June 30, 2012, also as described below. A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.

**Material Weakness in Internal Control Over Financial Reporting**

In connection with the assessment of our internal control over financial reporting, and present during the periods described above, management identified the following deficiency that constituted a material weakness in our internal control over financial reporting:

*• We did not maintain an effective control environment, as evidenced by not having appropriate personnel qualified to review complex, nonroutine business transactions that require additional review and impact decisions requiring accounting treatment, financial statement*

***presentation and disclosure***.

The material weakness described above resulted in the need to restate our annual and interim consolidated financial statements. As a result of this material weakness, management concluded that we did not maintain effective internal control over financial reporting for the periods described above.  (Emphasis added.)

83.    Nevertheless, the Company declared in that 10-Q that those issues were

"fully remediated":

**Remediation of Material Weakness as of June 30, 2012**

We have identified and engaged an external resource for the purpose of performing detailed accounting analysis of complex, nonroutine business transactions to remediate the material weakness that existed in the periods described above in our internal control over financial reporting.

Management has re-evaluated the operational effectiveness of our internal controls over financial reporting and with the addition of the reviews now being provided by our external resource believes that the Material Weakness which had previously existed has been fully remediated, and further that the Company's internal controls over financial reporting were fully effective as of June 30, 2012.

We will continue to monitor the effectiveness of our internal control over financial reporting in the areas affected by the material weakness described above and employ any additional tools and resources deemed necessary to ensure that our financial statements are fairly stated in all material respects.

**Changes in Internal Control Over Financial Reporting**

Except as described above, there were no significant changes in our internal controls over financial reporting during the quarter ended June 30, 2012, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

84.    The Form 10-Q for the second quarter of 2012 ended June 30, 2012, also contained the required Sarbanes-Oxley certifications substantially similar to the

certifications contained in ¶ 50, which were signed and certified by Durham and McKinnies.

85.     These statements made by the Company, Durham, and McKinnies regarding the Company's results for the quarter ended June 30, 2012, were materially false and misleading because they failed to disclose or indicate the following: (1) the Company had applied an improper methodology to recognize revenue on its EC Contracts, which resulted in revenue being prematurely recognized by the Company and which fact was apparent to the Company's senior management, based upon the business operations of Advanced Emissions, and made material errors in the accrual of revenues; (2) as a result, the Company's reported revenues and financial results were overstated; (3) as such, the Company's financial statements were not prepared in accordance with GAAP; (4) the Company lacked adequate internal and financial controls, which rendered the Company's financial statements inherently unreliable; (5) the Company's accounting, internal control and financial reporting systems and functions were disorganized, technologically deficient, understaffed and effectively in a shambles, thereby rendering its financial reporting and statements inherently unreliable and highly suspect, and these facts were known to senior management, including Durham and McKinnies, or, at a minimum, were recklessly disregarded and willfully ignored by these Defendants; and (6) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

86.     After disclosing in its 2012 second quarter financial report the material

weakness in its internal control over financial reporting with respect to the Company's May 2011 equity investment in Clean Coal, the Company issued restatements for its 2011 quarterly and annual financial reports and for its 2012 first quarter report on October 19, 2012 ("2012 Restatements").

87.     The 2012 Restatements modified the net losses and other figures related to the Company's misrepresentation of its equity investment in Clean Coal, but there were no changes or disclosures regarding the Company's EC segment or material weaknesses disclosed regarding financial reporting or internal controls with respect to the EC segment.

### vii.     The Company's Third Quarter Results For 2012

88.     On November 7, 2012, the Company issued a press release announcing its third quarter results for 2012 for the period ended September 30, 2012, which quoted Durham and stated, in relevant part:

**OVERVIEW OF 2012 THIRD QUARTER RESULTS**

• Total revenues increased to $74.4 million from $13.2 million in the third quarter of 2011, primarily due to the operations at seven Refined Coal ("RC") facilities four of which were leased to third parties and RC sales from the portion of the seven facilities operational during the third quarter that were operated by Clean Coal Solutions, LLC ("Clean Coal") for its own account.

• Gross margin was $4.0 million, or 5% of revenues, compared to $7.2 million, or 54% of revenues, for the same period in 2011, due to the impact of RC sales, raw coal purchases and operating costs related to the RC facilities operated by Clean Coal for its own account in the 2012 third quarter. Excluding the impact of RC coal sales, raw coal purchases and operating costs from these RC facilities, gross margin in the third quarter of 2012 was 80%.

• Operating loss was $3.3 million, compared to operating income of $3.5 million for the third quarter of 2011 due to approximately $8 million in operating costs related to the RC facilities operated for Clean Coal's account.

• Pre-tax loss from continuing operations before non-controlling interest was $4.1 million from a loss of $1.6 million in the third quarter of 2011 due to ADA's share of those same costs, interest expense and royalties.

• Net loss was $3.9 million compared to a restated net loss of $4.6 million in the same period last year.

• Clean Coal generated $16.1 million in tax credits from the operations of RC facilities for its own account, 42.5% of which is allocated to ADA.

• Cash and cash equivalents were $17.5 million at September 30, 2012.

*       *       *

***Emissions Control***

EC revenues increased by 12% to $3.5 million for the third quarter of 2012 from $3.1 million in last year's third quarter, driven by an increase in systems and equipment sales. Dr. Durham stated, "Driven by the EPA Mercury and Air Toxics Standard (MATS), we expect that the market for sales of ACI and DSI systems will eventually total $1 billion. We anticipate that this will create $350 million in equipment sales for us over the next three years. In the third quarter, ADA closed on the $5 million purchase of the assets of Bulk Conveyor Specialist Inc. (BCSI), the market leader in DSI systems with an approximately 40% market share. We recently announced that BCSI signed a contract to supply up to four DSI systems for a group of coal-fired generating plants with a total value of up to $14 million if the power company elects to purchase all of the contracted systems. The project will begin generating revenues immediately and deliveries are scheduled over the next 15 months. We expect that additional contracts for DSI systems will be awarded soon as BCSI has $140 million in active bids on systems being considered by customers.

"MATS is also expected to create a new market opportunity for ACI systems of approximately $500-$600 million, based upon the anticipated purchase of 400-600 new systems over the next three years. MATS has created a significant increase in procurement activities and we have been

-71-

very busy responding to this market. ADA has active bids on over $119 million for ACI systems, and the contracts are just beginning to be awarded. We recently announced two contracts for ACI systems including one for a cement plant. In addition, we have been notified of a fleet-wide award for ACI systems that is expected to be in the $10-$20 million range. We expect that all three contracts will begin generating revenues starting this month."

89.     That same day, the Company held an earnings conference call regarding the quarterly report, in which McKinnies and Durham repeated the same false and misleading statements regarding the Company's financial conditions and the EC segment.

90.     On November 9, 2012, the Company filed its Form 10-Q quarterly report for the period ended September 30, 2012, with the SEC.  The Company's Form 10-Q was signed and certified by Durham and McKinnies, and reaffirmed the Company's financial results previously announced on May 8, 2012.  With respect to the EC segment, the Form 10-Q stated, in relevant part:

*Emission Control*

Revenues in our EC segment totaled $3.5 million and $10.2 million for the three and nine months ended September 30, 2012, respectively, compared to $3.1 million and $6.8 million for the three and nine months ended September 30, 2011, respectively, representing an increase of 12% and 49% for the quarter and year to date.

The amounts reported exclude the work ADA has conducted for Clean Coal, as further described below, which was eliminated in our consolidation. Revenues from the EC segment for the nine months ended September 30, 2012 were comprised of sales of ACI and DSI systems and services (63%), consulting and demonstration services (31%) and flue gas chemicals and services (6%) compared to 30%, 59%, and 11%, respectively, for the same period in 2011. We expect our EC segment revenues related to ACI and DSI systems to continue to grow in 2013

when we expect utilities, cement plants and industrial boilers to start placing orders due to the MATS and other MACT regulations. We expect our gross margin percentage for our EC segment for 2012 will approximate 25%.

Our consulting revenues totaled $1 million and $3.2 million for the three and nine months ended September 30, 2012, respectively, compared to $2.1 million and $4 million for the same periods in 2011, representing a decrease of 53% and 21% from the same periods in 2011. Thus far in 2012 the size and scope of our consulting contracts has been lower than those we worked on in 2011. We are continuing with demonstrations and other work related to the MATS and we expect our consulting revenue to continue to be a significant part of EC revenues during 2013 as several customers are seeking alternatives on how best to comply with the MATS.

As of September 30, 2012, we had contracts in progress for work related to our EC segment totaling approximately $3.9 million, which we expect to recognize during the remainder of 2012 and during the first and second quarters of 2013. Our ACI and DSI systems revenues totaled $2.3 million and $6.5 million for the three and nine months ended September 30, 2012, respectively, representing an increase of 154% and 215% compared to the same periods in 2011. In the EC segment, we performed work related to RC facilities provided to Clean Coal valued at $199,000 and $2.2 million for the three and nine months ended September 30, 2012, respectively, compared to $1 million and $1.5 million for the same periods in 2011, which would otherwise be recognized as revenue but was eliminated in the consolidation of Clean Coal.

Cost of revenues for the EC segment increased by $728,000 and $4.1 million for the three and nine months ended September 30, 2012, respectively, compared to the same periods in 2011, primarily as a result of the increased revenue-generating activities from our ACI and DSI system sales. Gross margins for the EC segment were 23% for both the three and nine months ended September 30, 2012, respectively, compared to 37% and 45% for the same periods in 2011. The decrease in gross margin from the prior year is primarily a result of a higher percent of work in this segment related to ACI systems that carry lower margin than our typical consulting work and increased costs related to our ACI systems activities including hiring additional staff required for expected growth.

EC segment profits decreased by $950,000, or 118%, and $1.7 million, or

98%, for the three and nine months ended September 30, 2012, respectively, compared to the same periods in 2011. The decrease was primarily a result of lower margins and hiring of additional staff for expected growth as discussed above.

91.     The Form 10-Q also provided that the "accompanying unaudited interim

consolidated financial statements have been prepared in accordance with U.S.

generally accepted accounting principles for interim financial statements and with the

instructions to Form 10-Q and Article 10 of Regulation S-X.... The Company prepares

its consolidated financial statements in conformity with U.S. generally accepted

accounting principles."

92.     Regarding the Company's internal controls over financial reporting, the

Form 10-Q stated in relevant part:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation and under [the] supervision of our Chief Executive Officer and Chief Financial Officer, have reviewed and evaluated the effectiveness of the Company's disclosure controls and procedures as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e), as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on their review and evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are adequate and effective to ensure that material information related to our financial statements are made known to them by others in a timely manner, particularly during the period in which this quarterly report on Form 10-Q was being prepared, and that no changes are required at this time.

**Changes in Internal Control Over Financial Reporting**

There were no changes in our internal controls over financial reporting during the quarter ended September 30, 2012, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

As previously disclosed, the Company is in the process of creating a formal process related to the design and implementation of controls and establishment of adequate criteria to assess the positive and negative evidence over the establishment and maintenance of a valuation allowance against net deferred tax assets. Management anticipates that this process will include periodic oversight by the Audit Committee and anticipates completing this remediation effort before the filing of ADA's Annual Report on Form 10-K for the fiscal year ending December 31, 2012.

93.     The Form 10-Q for the third quarter of 2012 ended September 30, 2012, also contained the required Sarbanes-Oxley certifications substantially similar to the certifications contained in ¶ 50, which were signed and certified by Durham and McKinnies.

94.     These statements made by the Company, Durham, and McKinnies regarding the Company's results for the quarter ended September 30, 2012, were materially false and misleading because they failed to disclose or indicate the following: (1) the Company had applied an improper methodology to recognize revenue on its EC Contracts, which resulted in revenue being prematurely recognized by the Company and which fact was apparent to the Company's senior management, based upon the business operations of Advanced Emissions, and made material errors in the accrual of revenues; (2) as a result, the Company's reported revenues and financial results were overstated; (3) as such, the Company's financial statements were not prepared in accordance with GAAP; (4) the Company lacked adequate internal and financial controls, which rendered the Company's financial statements inherently unreliable; (5) the Company's accounting, internal control and financial reporting systems and

functions were disorganized, technologically deficient, understaffed and effectively in a shambles, thereby rendering its financial reporting and statements inherently unreliable and highly suspect, and these facts were known to senior management, including Durham and McKinnies, or, at a minimum, were recklessly disregarded and willfully ignored by these Defendants; and (6) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

### viii.    The Company's Annual And Fourth Quarter Results For 2012

95.    On March 14, 2013, the Company issued a press release announcing its annual results for 2012 and its fourth quarter results for the period ended December 31, 2012, which quoted Durham and stated, in relevant part:

**OVERVIEW OF 2012 FOURTH QUARTER RESULTS**

• Threefold increase in revenues from lease payments related to our Refined Coal ("RC") facilities. In the quarter, RC facilities operated by ADA's Clean Coal Solutions, LLC ("Clean Coal") generated $13.3 million in credits to be used to offset future taxes.

• A 40% increase in Emission Control ("EC") revenues. EC backlog as of December 31, 2012 increased to $25.3 million, up from $4.5 million at June 30, 2012 and $736,000 at December 31, 2011.

• Consolidated gross margin of $4.6 million, or 7% of revenues compared to $4.7 million or 19% of revenue in 2011. The lower margin percentage in 2012 is due to inclusion of coal purchases and sales and operating costs associated with RC facilities operated for Clean Coal's own account ("retained tons"). 2012 fourth quarter gross margin excluding coal sales and purchases and operating costs for retained tons was 69%.

• For the 4th quarter, our net loss was $5.4 million or $0.54 per diluted share as compared to a net income of $17.2 million or $1.90 per diluted share for 2011 which included a non-cash $20.0 million gain for the settlement of an indemnity claim.

**OVERVIEW OF 2012 RESULTS**

• An 83% increase in revenues from lease payments related to our RC facilities. In 2012, RC facilities operated by Clean Coal generated $38.6 million in credits to be used to offset future taxes.

• Gross margin of $20 million or 9% of revenues compared to $24.4 million or 46% of revenues in 2011. The 2012 gross margin excluding coal sales and purchases and operating costs for retained tons was 74%.

• For the year, our net loss was $13.1 million or $1.31 per diluted share as compared to a net loss of $22.8 million or $2.85 per diluted share for 2011.

\*     \*     \*

**Emissions Control**

EC revenues in the fourth quarter of 2012 were $4.4 million, up 40% from the same period in 2011 due mainly to increased equipment and consulting revenues as the power industry is reacting to finalization of the MATS rule.

Dr. Durham noted, "Finalization of the Mercury and Air Toxics Standards ("MATS") rule in April 2012, is creating significant market opportunities for the low-CAPEX technologies that ADA provides. We are expecting that the MATS could generate market opportunities in excess of $1 billion for ACI and DSI systems, of which we expect to maintain a combined market share of 35%.

"This would generate over $300 million in revenues for ADA over the next three years. We are pleased with our wins in the 4th quarter of 2012 and the recently announced awards for DSI and ACI systems so far in 2013. With these new contracts, ADA has received awards for DSI and ACI systems with a potential total value of over $50 million. In addition to these awards, ADA has active bids totaling over $125 million for ACI systems and over $160 million for DSI systems. The market for equipment to meet the federal MATS rules continues to accelerate and we expect that additional contracts for DSI and ACI systems will be awarded soon."

96.     That same day, the Company held an earnings conference call regarding

-77-

the quarterly and annual report, in which McKinnies repeated the same false and

misleading statements regarding the Company's financial conditions and the EC

segment:

> Turning to Slide 5, we highlight our emission control activities, which provide equipment, chemicals and services to help our customers meet existing and upcoming emission regulations. Since the Federal MATS rule was finalized in April of 2012, we've been responding to an increase in procurement activities for both our ACI and DSI systems. EC revenues in the fourth quarter of 2012 were $4.4 million, up 40% from the same period in 2011 due primarily to the increased equipment and consulting revenues as the power industry is reacting to the finalization of that MATS rule. EC gross margins were 25% in the quarter, a substantial improvement from the fourth quarter of 2011, which was impacted by work we performed for Clean Coal that was eliminated when we consolidated our results.

> As of December 31, 2012, we had contracts and progress for work related to our EC segment totaling approximately $25.3 million, up from only $736,000 as of December 31, 2011. We have active bids out for over $125 million for ACI systems and over $160 million for DSI systems.

> *      *      *

> Turning to Slide #7, which provides a summary of our consolidated financial performance in 2012, you'll see there that revenues amounted to $67.4 million for the fourth quarter or 174% more than in 2011 and $212.5 million for the year 2012 as compared to $53.3 million in 2011.

> *      *      *

> For the fourth quarter, our net loss was $5.4 million or $0.54 per diluted share as compared to a net income of $17.2 million or $1.90 per diluted share for 2011. For the year, our net loss was $13.1 million or $1.31 per diluted share as compared to a net loss of $22.8 million or $2.85 per diluted share for 2011.

97.    On March 18, 2013, the Company filed its Form 10-K annual report for its

fiscal year ended December 31, 2012, with the SEC.  The Company's Form 10-K was

signed and certified by Durham and McKinnies, and reaffirmed the Company's financial results previously announced on March 14, 2013. With respect to the EC segment, the Form 10-Q stated, in relevant part:

> *Emission Control*
>
> Revenues in our EC segment totaled $14.6 million in 2012 compared to $10 million in 2011, representing an increase of 47%. The amounts reported for 2012 and 2011 exclude the work ADA has conducted for Clean Coal, as further described below, which was eliminated in our consolidation. Revenues from the EC segment for 2012 were comprised of sales of ACI and DSI systems and services (66%), flue gas chemicals and services (5%) and other services (29%), compared to 42%, 9%, and 49%, respectively, in 2011. We expect our EC segment revenues related to ACI and DSI systems to continue to grow in 2013 when we expect utilities, cement plants and industrial boilers to continue placing orders in response to the MATS and other MACT regulations. We expect our gross margin percentage for our EC segment for 2013 will approximate 20 to 25%.
>
> Our consulting revenues totaled $4.2 million during 2012 compared to $4.9 million in 2011 representing a 14% decrease primarily due to a decrease in the size and scope of our consulting contracts, a result of potential clients deferring work on MATS compliance until 2013. We are continuing with demonstrations and other work related to the MATS and we expect our consulting revenue to continue to be a significant part of EC revenues during 2013 as several customers are seeking alternatives on how best to comply with the MATS.
>
> As of December 31, 2012, we had contracts in progress for work related to our EC segment totaling $25.3 million which we expect to recognize as revenue in 2013 and 2014. Our ACI and DSI systems revenues totaled $9.6 million for 2012 representing an increase of 131% compared to 2011. In the EC segment, we performed work related to RC facilities provided to Clean Coal valued at $2.7 million for year-end 2012, respectively compared to $8.3 million for 2011, which would otherwise be recognized as revenue but was eliminated in the consolidation of Clean Coal. The 2011 amount includes work provided to Clean Coal for the 26 additional RC facilities placed-in-service.

Cost of revenues for the EC segment increased by $4.3 million or 63% in 2012 from 2011, primarily as a result of the increased revenue-generating activities from our ACI and DSI systems sales. Gross margin for the EC segment was 23.8% for 2012 compared to 31% for 2011. The decrease in gross margin from the prior year is primarily a result of a higher percent of work in this segment related to ACI and DSI systems that carry lower margins than our typical consulting work and increased costs related to our ACI and DSI systems activities including hiring additional staff required for expected growth.

EC segment profits decreased by $1.1 million or 79% for 2012 compared to 2011. The decrease was primarily a result of lower margins and overhead costs related to the hiring of additional staff for expected growth as discussed above.

98.     Regarding the Company's internal controls over financial reporting and adherence to the generally accepted accounting principles, the Form 10-K stated in relevant part:

We conducted an evaluation under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, (the "Exchange Act"), means controls and other procedures of a company that are designed to ensure that information required to be disclosed by the company in the reports it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms. Disclosure controls and procedures also include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Management necessarily applied its judgment in assessing the costs and benefits of such controls and procedures, which, by their nature, can provide only reasonable assurance regarding management's control objectives.

**Evaluation of Disclosure Controls and Procedures**

Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded as of December 31, 2012 that our disclosure controls and procedures are effective.

**Management's Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining effective internal control over financial reporting. Internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15(d)-15(f)) is defined as a process designed by, or under the supervision of, a company's principal executive and financial officers, or persons performing similar functions, and effected by a company's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with generally acceptable accounting principles and includes those policies and procedures that: (a) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (b) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (c) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

A material weakness is a control deficiency, or combination of control deficiencies, that result in more than a remote likelihood that a material misstatement of annual or interim financial statements will not be prevented or detected. Our management assessed our internal control over financial reporting as of December 31, 2012. Management based its assessment on criteria set forth in the framework in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on our management's assessments, we believe that, as of December 31, 2012, our internal control over financial reporting is effective based on those criteria.

*       *       *

-81-

### Changes in Internal Control Over Financial Reporting

There have been no changes in our internal control over financial reporting during the most recently completed fiscal quarter that have materially affected, or are likely to materially affect, our internal control over financial reporting.

99.     The Form 10-K for the fiscal year ended December 31, 2011, also contained the required Sarbanes-Oxley certifications substantially similar to the certifications contained in ¶ 50, which were signed and certified by Durham and McKinnies.

100.     These statements made by the Company, Durham and McKinnies regarding the Company's results for the fiscal year ended December 31, 2012, were materially false and misleading because they failed to disclose or indicate the following: (1) the Company had applied an improper methodology to recognize revenue on its EC Contracts, which resulted in revenue being prematurely recognized by the Company and which fact was apparent to the Company's senior management, based upon the business operations of Advanced Emissions, and made material errors in the accrual of revenues; (2) as a result, the Company's reported revenues and financial results were overstated; (3) as such, the Company's financial statements were not prepared in accordance with GAAP; (4) the Company lacked adequate internal and financial controls, which rendered the Company's financial statements inherently unreliable; (5) the Company's accounting, internal control and financial reporting systems and functions were disorganized, technologically deficient, understaffed and effectively in a

shambles, thereby rendering its financial reporting and statements inherently unreliable and highly suspect, and these facts were known to senior management, including Durham and McKinnies, or, at a minimum, were recklessly disregarded and willfully ignored by these Defendants; and (6) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

### ix.   The Company's First Quarter Results For 2013

101.   On May 8, 2013, the Company issued a press release announcing its first quarter results for 2013 for the period ended March 31, 2012, which quoted Durham and stated, in relevant part:

**OVERVIEW OF 2013 FIRST QUARTER RESULTS**

• Refined Coal ("RC") revenues from payments related to our leased and sold RC facilities were up 127% from the first quarter of 2012 and up 25% from the fourth quarter of 2012. In the quarter, RC facilities operated by ADA's joint venture Clean Coal Solutions, LLC ("Clean Coal") generated $12.6 million in credits to be used to offset future taxes (ADA owns 42.5% of Clean Coal).

• Emission Control ("EC") revenues were up more than threefold from the first quarter of 2012 and double the amount from the fourth quarter of 2012. EC backlog as of March 31, 2013 increased to $32.7 million, up from $25.3 million at December 31, 2012 and $4.6 million at March 31, 2012.

• Cash and cash equivalents increased to $22 million, up from $9.7 million at December 31, 2012.

• Successfully tested our M-45-PC™ technology at four power plants.

• Consolidated gross margin of $9.7 million, or 14% of revenues compared to $4 million or 22% of revenue in 2012. The lower margin percentage in the first quarter of 2013 is due to the inclusion of coal purchases and sales and operating costs associated with RC facilities

operated for Clean Coal's own account ("retained tons").

• For the first quarter of 2013, our net loss was $2.2 million or $0.22 per diluted share as compared to a net loss of $2.4 million or $0.24 per diluted share for first quarter of 2012.

\* \* \*

***Emission Control***

EC revenues in the first quarter of 2013 were $8.8 million, up more than threefold from a year ago due mainly to increased equipment and consulting revenues as the market for the Mercury and Air Toxics Standards ("MATS") rule is well underway.

Dr. Durham noted, "The market for equipment to meet the federal MATS rules is accelerating and evolving as we expected. ADA has taken a number of steps to prepare for this market, and we are pleased with the success to date in this competitive commercial market. Last week we announced that we recently received additional awards and letters of intent to award for approximately $30 million in ACI and DSI systems from multiple utilities. Since the MATS market commenced in 2011, ADA has won or received letters of intent to award contracts currently valued at approximately $75 million for DSI and ACI systems. We are currently working on bids or discussing potential projects for ACI and DSI systems in excess of $180 million.

102.    That same day, the Company held an earnings conference call regarding

the quarterly report, in which McKinnies repeated the same false and misleading

statements regarding the Company's financial conditions and the EC segment:

As of March 31, 2013, we had contracts in progress for work related to our EC segment totaling approximately $32.7 million, up from only $25.3 million as of December 31 and significantly up from the quarter end in 2012. ADA is currently working on bids or discussing potential projects totaling more than $180 million for ACI systems and DSI systems.

\* \* \*

Turning to Slide #12, we provide a summary of our consolidated financial

performance in 2013. Revenues totaled $68.3 million for the first quarter or more than 250% more than the first quarter of 2012. The increases for the quarter were driven by increases in our RC and EC activities, as previously discussed.

For the quarter then, our net loss was $2.2 million or $22 -- $0.22 per share as compared to a net loss of $2.4 million or $0.24 per share in the same quarter in 2012. Cash flow provided by operations was $17.1 million for the first quarter of 2013 as compared to cash used in operations totaling $9.2 million for the same period in 2012. Our balance sheet as of March 31, 2013, recorded cash and cash equivalents of $21.9 million and a working capital deficit of $11 million, which includes as liabilities, deposits and current deferred revenues totaling approximately $33 million.

103.    On May 10, 2013, the Company filed its Form 10-Q quarterly report for the period ended March 31, 2013, with the SEC.  The Company's Form 10-Q was signed and certified by Durham and McKinnies, and reaffirmed the Company's financial results previously announced on May 9, 2013.  With respect to the EC segment, the Form 10-Q stated, in relevant part:

*Emission Control*

Revenues in our EC segment totaled $8.8 million for the quarter ended March 31, 2013 compared to $2.8 million for the same period in 2012, representing an increase of 217%, primarily due to increased sales of ACI and DSI systems and the recognition of revenues for previously awarded sales contracts as well as revenues resulting from our acquisition of the assets of Bulk Conveyor. Revenues from the EC segment for the quarter ended March 31, 2013 were comprised of sales of ACI and DSI systems and services (86%), consulting and demonstration services (11%) and flue gas chemicals and services (3%) compared to 51%, 41%, and 8%, respectively, for the same period in 2012. We expect our EC segment revenues related to ACI and DSI systems to continue to grow significantly in 2013 as we expect utilities, cement plants and industrial boilers to continue placing orders in response to the MATS and other MACT regulations. We expect our gross margin percentage for our EC segment for 2013 will approximate 20% to 25%.

Our consulting revenues totaled $1 million for the quarter ended March 31, 2013 compared to $1.1 million for the same period in 2012. We are continuing with demonstrations and other work related to the MATS and we expect our consulting revenue to continue to be a significant part of EC revenues during 2013 as several customers are seeking alternatives on how best to comply with the MATS.

As of March 31, 2013, we had contracts in progress for work related to our EC segment totaling approximately $32.7 million, which we expect to recognize as revenue in 2013 and 2014. Our ACI and DSI systems revenues totaled $7.5 million for the quarter ended March 31, 2013, representing an increase of 433% compared to the same period in 2012, primarily due to increased sales of ACI and DSI systems and the recognition of revenues on previously awarded sales contracts as well as revenues resulting from our acquisition of the assets of Bulk Conveyor as discussed above.

Cost of revenues for the EC segment increased by $4.2 million for the first quarter of 2013 compared to the same period in 2012, primarily as a result of the increased revenue-generating activities from our ACI and DSI system sales. Gross margin for the EC segment was 29% for the first quarter of 2013 compared to 25% for the same period in 2012.

EC segment profits increased by $1.5 million for the quarter ended March 31, 2013 compared to the same period in 2012. The increase was primarily a result of higher margins on recent contract awards and a reduction in overhead costs from 2012.

104.    Regarding the Company's internal controls over financial reporting, the

Form 10-Q stated in relevant part:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation and under supervision of our Chief Executive Officer and Chief Financial Officer, have reviewed and evaluated the effectiveness of the Company's disclosure controls and procedures as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e), as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on their review and evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are adequate and effective to

ensure that material information related to our financial statements are made known to them by others in a timely manner, particularly during the period in which this quarterly report on Form 10-Q was being prepared, and that no changes are required at this time.

**Changes in Internal Control Over Financial Reporting**

There have been no changes in our internal controls over financial reporting during the most recently completed fiscal quarter that have materially affected, or are likely to materially affect, our internal control over financial reporting.

105.    The Form 10-Q for the first quarter of 2013 ended March 31, 2013, also contained the required Sarbanes-Oxley certifications substantially similar to the certifications contained in ¶ 50, which were signed and certified by Durham and McKinnies.

106.    These statements made by the Company, Durham and McKinnies regarding the Company's results for the quarter ended March 31, 2013, were materially false and misleading because they failed to disclose or indicate the following: (1) the Company had applied an improper methodology to recognize revenue on its EC Contracts, which resulted in revenue being prematurely recognized by the Company and which fact was apparent to the Company's senior management, based upon the business operations of Advanced Emissions, and made material errors in the accrual of revenues; (2) as a result, the Company's reported revenues and financial results were overstated; (3) as such, the Company's financial statements were not prepared in accordance with GAAP; (4) the Company lacked adequate internal and financial controls, which rendered the Company's financial statements inherently unreliable; (5)

-87-

the Company's accounting, internal control and financial reporting systems and functions were disorganized, technologically deficient, understaffed and effectively in a shambles, thereby rendering its financial reporting and statements inherently unreliable and highly suspect, and these facts were known to senior management, including Durham and McKinnies, or, at a minimum, were recklessly disregarded and willfully ignored by these Defendants; and (6) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

### x.    The Company's Second Quarter Results For 2013

107.    On August 7, 2013, the Company issued a press release announcing its second quarter results for 2013 for the period ended June 30, 2013, which quoted Durham and stated, in relevant part:

**OVERVIEW OF 2013 SECOND QUARTER RESULTS**

• Refined Coal ("RC") revenues from payments related to our leased and sold RC facilities were up 10% from the second quarter of 2012 and down 5% from the first quarter of 2013 due to seasonal factors. In the quarter, RC facilities operated by the Clean Coal Solutions, LLC ("Clean Coal") joint venture generated $7.7 million in credits to be used to offset future taxes (the Company's wholly owned subsidiary, ADA-ES Inc., owns 42.5% of Clean Coal).

• Emission Control ("EC") revenues more than doubled from the second quarter of 2012 and were up 37% from the first quarter of 2013. EC backlog as of June 30, 2013 was $33.2 million, up from $4.5 million at June 30, 2012 and from $32.7 million at March 31, 2013.

• Cash and cash equivalents were $12.3 million, up from $9.7 million at December 31, 2012 but down from $22 million at March 31, 2013. This cash balance does not include the more than $14 million received by Clean Coal in late July in conjunction with the closing of leases for two RC facilities.

• Continued progress with investors and utilities for additional RC facilities, including multiple sites that are expected to use our M-45-PC TM technology.

• Consolidated gross margin of $10.6 million, or 18% of revenues compared to $7.4 million or 14% of revenues in 2012. The margin percentage was negatively impacted by the inclusion of coal purchases and sales and operating costs associated with RC facilities operated for Clean Coal's own account ("retained tons").

• For the second quarter of 2013, our net loss was $3.2 million or $0.32 per diluted share as compared to a net loss of $1.3 million or $0.13 per diluted share for second quarter of 2012.

\*        \*        \*

*Emission Control*

EC revenues in the second quarter of 2013 were $12 million, up more than 200% from the second quarter 2012 due mainly to increased equipment and consulting revenues as the market for the Mercury and Air Toxics Standards ("MATS") rule is well underway.

Dr. Durham noted, "The market for equipment to meet the federal MATS rule continues to accelerate and evolve as we expected and we are pleased with our win rate thus far. In the recent months, we have received additional awards and letters of intent to award, some of which are not reflected in our backlog at June 30th. We are currently working on bids or discussing potential projects for ACI and DSI systems in excess of $150 million."

108.    That same day, the Company held an earnings conference call regarding

the quarterly report, in which McKinnies repeated the same false and misleading

statements regarding the Company's financial conditions and the EC segment:

EC revenues in the second quarter were $12 million, which were up over 200% from the same period in 2012, due primarily to increased equipment revenues as we make progress on the contracts awarded in response to the MATS rule.

-89-

EC segment gross margin of 19% was lower than the 22% from the year-ago period, primarily reflecting a different product mix in the quarter. Given our percentage of completion, revenue recognition accounting, and an evolving mix of jobs won and products produced, results in this segment may be somewhat lumpy when comparing quarterly periods. However, we continue to expect the medium-term gross margin for this segment to be about 20%.

As of June 30, 2013, we had contracts in progress for work related to our EC segment totaling approximately $33.2 million, up from the $32.7 million as of March 31, 2013. As Mike mentioned, there is a large contract that we expect to book in the backlog during the third quarter, not included in those numbers.

\*        \*        \*

For the second quarter of 2013, our net loss was $3.2 million or $0.32 per basic and diluted share, as compared to a net loss of $1.3 million or $0.13 per share for 2012.

109.   On August 9, 2013, the Company filed its Form 10-Q quarterly report for the period ended June 30, 2013, with the SEC.  The Company's Form 10-Q was signed and certified by Durham and McKinnies, and reaffirmed the Company's financial results previously announced on August 8, 2013.  With respect to the EC segment, the Form 10-Q stated, in relevant part:

*Emission Control*

Revenues in our EC segment totaled $12 million and $20.8 million for the three and six months ended June 30, 2013, respectively, compared to $4.0 million and $6.7 million for the same periods in 2012, representing an increase of 203% and 209% for the quarter and year to date primarily due to increased sales of ACI and DSI systems and the recognition of revenues for previously awarded sales contracts as well as additional equipment sales revenues resulting from our acquisition of the assets of Bulk Conveyor in August 2012. Revenues from the EC segment for the six months ended June 30, 2013 were comprised of sales of ACI and DSI systems and services (84%), consulting and demonstration services

(15%) and flue gas chemicals and services (1%) compared to 62%, 32%, and 6%, respectively, for the same periods in 2012. We expect our EC segment revenues related to ACI and DSI systems to continue to grow significantly in 2013 as we expect utilities, cement plants and industrial boilers to continue placing orders in response to the MATS and other MACT regulations. We expect our gross margin percentage for our EC segment for 2013 will approximate 20%.

Our consulting revenues totaled $2 million and $3 million for the three and six months ended June 30, 2013, respectively, compared to $1 million and $2.1 million for the same periods in 2012, representing an increase of 91% and 38% from the same periods in 2012 as we continued demonstrations and other work related to the MATS. We expect our consulting revenue to continue to be a significant part of EC revenues during 2013 as customers continue to seek alternatives on how best to comply with the MATS.

As of June 30, 2013, we had contracts in progress for work related to our EC segment totaling $33.2 million, which we expect to recognize as revenue starting in the last half of 2013 and the remainder in 2014 and 2015. Our ACI and DSI systems revenues totaled $9.9 million and $17.4 million for the three and six months ended June 30, 2013, respectively, representing an increase of 261% and 319% compared to the same periods in 2012. The change was primarily due to increased sales of ACI and DSI systems and the recognition of revenues on previously awarded sales contracts as well as revenues from BCSI.

Cost of revenues for the EC segment increased by $6.6 million and $10.8 million or 215% and 210%, respectively, for the three and six months ended June 30, 2013, respectively, compared to the same periods in 2012, primarily as a result of the increased revenue-generating activities from our ACI and DSI system sales. Gross margins for the EC segment were 19% and 23% for the three and six months ended June 30, 2013 compared to 22% and 23% for the same periods in 2012.

EC segment profits increased by $1.6 million and $3.2 million for the three and six months ended June 30, 2013, respectively, compared to the same periods in 2012. The increase was primarily a result of increased levels of business from recent contract awards and a reduction in overhead costs compared to 2012.

110.    Regarding the Company's internal controls over financial reporting, the

Form 10-Q stated:

### Evaluation of Disclosure Controls and Procedures

Our management, with the participation and under supervision of our Chief Executive Officer and Chief Financial Officer, have reviewed and evaluated the effectiveness of the Company's disclosure controls and procedures as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e), as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on their review and evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are adequate and effective to ensure that material information related to our financial statements are made known to them by others in a timely manner, particularly during the period in which this quarterly report on Form 10-Q was being prepared, and that no changes are required at this time.

### Changes in Internal Control Over Financial Reporting

There were no changes in our internal controls over financial reporting during the most recently completed fiscal quarter that have materially affected, or are likely to materially affect, our internal control over financial reporting.

111.    The Form 10-Q for the second quarter of 2013 ended June 30, 2013, also contained the required Sarbanes-Oxley certifications substantially similar to the certifications contained in ¶ 50, which were signed and certified by Durham and McKinnies.

112.    These statements made by the Company, Durham and McKinnies regarding the Company's results for the quarter ended June 30, 2013, were materially false and misleading because they failed to disclose or indicate the following: (1) the Company had applied an improper methodology to recognize revenue on its EC Contracts, which resulted in revenue being prematurely recognized by the Company

and which fact was apparent to the Company's senior management, based upon the

business operations of Advanced Emissions, and made material errors in the accrual of

revenues; (2) as a result, the Company's reported revenues and financial results were

overstated; (3) as such, the Company's financial statements were not prepared in

accordance with GAAP; (4) the Company lacked adequate internal and financial

controls, which rendered the Company's financial statements inherently unreliable; (5)

the Company's accounting, internal control and financial reporting systems and

functions were disorganized, technologically deficient, understaffed and effectively in a

shambles, thereby rendering its financial reporting and statements inherently unreliable

and highly suspect, and these facts were known to senior management, including

Durham and McKinnies, or, at a minimum, were recklessly disregarded and willfully

ignored by these Defendants; and (6) as a result of the foregoing, the Company's

financial statements were materially false and misleading at all relevant times.

### xi.   The Company's Third Quarter Results For 2013

113.   On November 7, 2013, the Company issued a press release announcing

its third quarter results for 2013 for the period ended September 30, 2013, which

quoted Durham and stated, in relevant part:

**2013 THIRD QUARTER HIGHLIGHTS**

Third quarter earnings of $1.6 million, or $0.16 per diluted share
compared to a net loss of $3.9 million or $0.39 per diluted share for third
quarter of 2012.

• Record Emission Control ("EC") backlog and revenues
    o Backlog of $56.6 million up from $33.2 million at June 30,

-93-

2013.
o Revenues of $14.5 million more than tripled from the third
quarter of 2012 and were up more than 20% from the
second quarter of 2013.

• Refined Coal ("RC") rental and other income of $20.3 million, up more
than 80% from the third quarter of 2012 and 63% from the second quarter
of 2013. RC facilities operated by the Clean Coal Solutions, LLC ("Clean
Coal") joint venture generated $6.8 million in credits during the quarter to
be used to offset future taxes (the Company's wholly owned subsidiary,
ADA-ES Inc. ("ADA"), owns 42.5% of Clean Coal).

• Two additional RC facilities leased to investors in the quarter, significant
progress with investors and utilities for additional RC facilities. The
Company expects to have all 28 RC facilities in full-time operation by the
end of 2014.

THIRD QUARTER OPERATIONAL ACHIEVEMENTS, OVERVIEW OF
SEGMENTS AND OUTLOOK

Dr. Michael D. Durham, President and CEO of Advanced Emissions
Solutions stated, "We are very pleased with the performance in all of our
businesses this quarter. This is an exciting time for the Company as the
market and regulatory drivers are firmly in place now and we appear to be
in a great position with the right products at the right time. Our Emission
Control business is accelerating as utilities and other industries prepare to
comply with new emission regulations scheduled to take effect in the
coming years. The Refined Coal business is also gaining momentum with
a number of additional RC facilities beginning or scheduled to begin
full-time operations, and others leased to RC investors. In addition, we are
positioning ourselves for continued long-term success and are developing
technologies for expected future markets."

_Emission Control_

EC revenues in the third quarter of 2013 were a record $14.5 million, up
more than 300% from the third quarter of 2012. Our equipment and
consulting businesses are accelerating as utilities prepare to comply with
the Mercury and Air Toxics Standards ("MATS") rule. Equipment backlog
at September 30, 2013 totaled $56.6 million, up from $33.2 million at June
30, 2013 and up from $3.9 million at September 30, 2012.

Dr. Durham noted, "The record backlog and revenues in the EC segment reflect the momentum of the MATS equipment market and our industry leading position in that market. We believe our ability to offer both ACI and DSI systems along with our years of experience and technical expertise, allows us to provide our customers with more than just a hardware purchase. We have won additional awards since September and we are currently working on bids and discussing potential projects for ACI and DSI systems in excess of $120 million."

114.    That same day, the Company held an earnings conference call regarding

the quarterly report, in which McKinnies made the same false and misleading

statements regarding the Company's financial conditions and the EC segment:

Turning to slide number 10, we highlight our emission control -- or EC -- segment activities, which provide the equipment, chemicals, and services to help our customers meet existing and upcoming emission regulations. EC revenues in the third quarter were $14.5 million, which were up over 300% from the same period in 2012, due primarily to increased equipment revenues, as we progress on the contracts awarded in response to the MATS rule.

The EC segment gross margin of 18% was lower than the 23% in the year-ago period, primarily reflecting a different product mix in the quarter. Given our percentage of completion revenue recognition accounting, and an evolving mix of jobs won and products produced, results in this segment may be somewhat lumpy when comparing quarterly periods. However, we expect to report continued growth, with a medium-term gross margins in this segment to be about 20%. As of September 30, 2013, we had contracts and progress for work related to or EC segment totaling approximately $56.6 million, up from $33.2 million as of the end of June 30, 2013.

\*       \*       \*

For the third quarter of 2013, our net income was $1.6 million or $0.16 per basic and diluted share, compared to a net loss of $3.9 million or $0.39 per share for 2012.

115.    On November 12, 2013, the Company filed its Form 10-Q quarterly report

for the period ended September 30, 2013, with the SEC.  The Company's Form 10-Q

was signed and certified by Durham and McKinnies, and reaffirmed the Company's

financial results previously announced on November 7, 2013.  With respect to the EC

segment, the Form 10-Q stated, in relevant part:

*Emission Control*

The following table presents consolidated revenues, cost of revenues, gross margin, segment profit and related percentages and changes for the EC segment (in thousands except for percentages):

Three Months Ended September 30,

|  | 2013 | 2012 | $ Change | % Change |
| --- | --- | --- | --- | --- |
| Systems and equipment | $ 12,094 | 2,299 | 9,795 | 426% |
| Consulting and development | 2,150 | 968 | 1,182 | 122% |
| Chemicals | 254 | 213 | 41 | 19% |
| Total Revenue | $ 14,498 | 3,480 | 11,018 | 317% |
|  |  |  |  |  |
| Cost of revenues | 11,836 | 2,683 | 9,153 | 341% |
| Gross margin | $ 2,662 | 797 | 1,865 |  |
| Gross margin percentage | 18% | 23% |  | (5)% |
| Segment profit | $2,091 | (147) | 2,237 |  |

Nine Months Ended September 30,

|  | 2013 | 2012 | $ Change | % Change |
| --- | --- | --- | --- | --- |

| | | | | |
|---|---|---|---|---|
| Systems and equipment | $ 29,534 | 6,456 | 23,078 | 357% |
| Consulting and development | 5,174 | 3,162 | 2,012 | 64% |
| Chemicals | 573 | 591 | (18) | (3)% |
| Total Revenue | $ 35,281 | 10,209 | 25,072 | 246% |
| | | | | |
| Cost of revenues | 27,800 | 7,838 | 19,962 | 255% |
| Gross margin | $ 7,481 | 2,371 | 5,110 | |
| Gross margin percentage | 21% | 23% | | (2)% |
| Segment profit | $5,449 | 30 | 5,419 | |

Revenues increased in the current periods shown compared to the same periods in 2012 primarily due to increased sales of ACI and DSI systems, the recognition of revenues for previously awarded sales contracts as well as additional equipment sales revenues resulting from our acquisition of the assets of Bulk Conveyor in August 2012. We expect our EC segment revenues related to ACI and DSI systems to continue to grow significantly as we expect utilities, cement plants and industrial boilers to continue placing orders in response to the MATS and other MACT regulations.

As of September 30, 2013, we had contracts in progress for work related to our EC segment totaling $56.6 million, which we expect to recognize as revenue starting in the last three months of 2013 and the remainder in 2014 and 2015.  Cost of revenues increased for the periods shown compared to the same periods in 2012 primarily as a result of the increased revenue-generating activities from our ACI and DSI system sales. Gross margins decreased for the periods shown compared to the same periods in 2012 due primarily to competitive pricing we have employed to maintain our market share goals and product mix. We expect the gross margin percentage for our EC segment for 2013 and into 2014 will approximate 20%.

EC segment profits increased for the current periods shown compared to

the same periods in 2012 primarily due to the increased levels of business from recent contract awards.

116.    Regarding the Company's internal controls over financial reporting, the

Form 10-Q stated:

### Evaluation of Disclosure Controls and Procedures

Our management, with the participation and under supervision of our Chief Executive Officer and Chief Financial Officer, have reviewed and evaluated the effectiveness of the Company's disclosure controls and procedures as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e), as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on their review and evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are adequate and effective to ensure that material information related to our financial statements are made known to them by others in a timely manner, particularly during the period in which this quarterly report on Form 10-Q was being prepared, and that no changes are required at this time.

### Changes in Internal Control Over Financial Reporting

There were no changes in our internal controls over financial reporting during the most recently completed fiscal quarter that have materially affected, or are likely to materially affect, our internal control over financial reporting.

117.    The Form 10-Q for the third quarter of 2013 ended September 30, 2013,

also contained the required Sarbanes-Oxley certifications substantially similar to the

certifications contained in ¶ 50, which were signed and certified by Durham and

McKinnies.

118.    These statements made by the Company, Durham and McKinnies

regarding the Company's results for the quarter ended September 30, 2013, were

materially false and misleading because they failed to disclose or indicate the following:

(1) the Company had applied an improper methodology to recognize revenue on its EC Contracts, which resulted in revenue being prematurely recognized by the Company and which fact was apparent to the Company's senior management, based upon the business operations of Advanced Emissions, and made material errors in the accrual of revenues; (2) as a result, the Company's reported revenues and financial results were overstated; (3) as such, the Company's financial statements were not prepared in accordance with GAAP; (4) the Company lacked adequate internal and financial controls, which rendered the Company's financial statements inherently unreliable; (5) the Company's accounting, internal control and financial reporting systems and functions were disorganized, technologically deficient, understaffed and effectively in a shambles, thereby rendering its financial reporting and statements inherently unreliable and highly suspect, and these facts were known to senior management, including Durham and McKinnies, or, at a minimum, were recklessly disregarded and willfully ignored by these Defendants; and (6) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

C.      **The Truth Slowly Emerges**

119.    The Company's 2013 third quarter report for the period ending September 30, 2013 would be the last financial statement the Company filed with the SEC.  From March 13, 2014 until January 29, 2015, a series of revelations and corrective disclosures brought to light the extent and seriousness of the Company's false and misleading statements, as well as the profound absence of adequate internal and

financial controls within Advanced Emissions.

120.   On March 13, 2014, which was approximately the time of the year in which the Company usually announced its performance for its fourth quarter and the previous fiscal year, the Company instead issued a press release announcing that it would be rescheduling its 2013 fourth quarter and year-end news release and conference call because of issues related to overstating the revenues and margins of the EC segment:

> Beginning with the fiscal year ended December 31, 2013, the Company engaged KPMG LLP as its new independent registered public accounting firm. The Company is currently reviewing its accounting practices, particularly its methods of recognizing revenue for its Emission Control business segment contracts. The Company expects the result of this review will likely result in increased operating losses, primarily driven by a reduction of revenues and margins for its emission control segment with a corresponding increase in backlog for the same period.

121.   As described below, the delay was the result of KPMG's demands after it discovered the consistent overstating of EC revenue and the resulting impact on net losses and other financial results.  As noted above, KPMG had replaced the Company's previous auditor, EKS&H, which had audited the Company's 2011 and 2012 annual reports.

122.   Nevertheless, the Company diminished the seriousness of this delay and effectively characterized the issues as marginal, given that the requested extension was a minimal 15-day extension:

> The Company expects to file a Form 12b-25 with the Securities Exchange Commission requesting an automatic extension of 15 calendar days to file its Annual Report on Form 10-K for 2013 on or before the deadline for

such filing.

123.     But, on March 18, 2014, the Company filed a notice of late filing with the

SEC, revealing that, in fact, its required restatement would not be immaterial, and that

the Company would be required to adjust reported revenues by reducing them by $9

million and increasing ADES' net losses by $2 million in the aggregate for the first three

quarters of 2013:

> The Corporation has not finalized its assessment of the effectiveness of
> its internal control over financial reporting and is reviewing its accounting
> practices with respect to its methods of recognizing revenue for its
> Emission Control business segment contracts using the percentage of
> completion method based on labor hours. The Corporation believes it may
> have a material weakness related to its revenue recognition. The
> Corporation expects the result of its review of revenue recognition and
> other immaterial adjustments will likely result in a reduction of revenues of
> approximately $9 million and an increase in net losses by approximately
> $2 million in the aggregate for the first three quarters of 2013 from those
> amounts previously reported. The Corporation also expects an increase in
> backlog as of September 30, 2013.

124.     Nevertheless, the Company continued to falsely and misleadingly

reassure the SEC and investors that such issues would be quickly resolved in time to

file an accurate picture of the Company's financial health by the end of the month:

> The Corporation's management team and its finance and accounting
> personnel have been working diligently to complete this review; however,
> the Corporation is not able to timely complete the preparation of its
> financial statements and related disclosures to be included in its Annual
> Report on Form 10-K without unreasonable effort or expense. The
> Corporation expects to file its Annual Report on Form 10-K for the year
> ended December 31, 2013 on or before April 1, 2014.

125.     The Company missed this new deadline of April 1, 2014 without

explanation or rationale.

126.    Then, on April 24, 2014, the Company informed the SEC and investors that its financial statements filed for the quarters ended March 31, 2013, June 30, 2013 and September 30, 2013, also could not be relied upon, or, in other words, that the financial results reported in these SEC filings and related statements to investors were, in fact, false and misleading in nature:

> The Company has identified significant deficiencies in its controls over financial reporting that may result in additional material weaknesses. As a result, the Company today filed a Current Report on Form 8-K disclosing various matters including that the financial statements for the quarters ended March 31, 2013, June 30, 2013 and September 30, 2013 ("2013 Restatement Periods") should no longer be relied upon and should be restated.

127.    The Company also expanded the previous estimate of a $9 million reduction in revenue and $2 million increase in net loss to a $10.8 million reduction in revenue and a $2.3 million increase in net loss:

> The Company believes that the result of the restatement of the 2013 Restatement Periods will be a reduction of revenues of approximately $10.8 million (with a corresponding increase in backlog) and an increase in the loss before income taxes of approximately $2.3 million from those amounts previously reported. The increase in the reported loss before income taxes primarily consists of the deferred recognition of the revenue and associated margin under the EC Contracts and the accrual of additional IRC 453A Interest. Other issues may be identified and additional impacts may occur as a result of continuing the review.

128.    On August 21, 2014, the Company disclosed that the false and misleading statements were not limited to the quarterly reports for 2013, but also included its quarterly and annual reports filed with the SEC for 2011 and 2012:

> Advanced Emissions Solutions, Inc. (NASDAQ:ADES) (the "Company") today announced that the Audit Committee (the "Audit Committee") of its

Board of Directors, upon the recommendation of the Company's management, has determined that the Company's financial statements filed on Form 10-Q for the quarters ended March 31, June 30, and September 30 of 2011 and 2012, or the annual financial statements filed on Form 10-K for the years ended December 31, 2011 and 2012 (the "Non-Reliance Periods") should not be relied upon and will likely be restated.

129.   Five months later, on January 29, 2015, the Company revealed that KPMG had effectively resigned in protest because of its frustration with and determination of ADES management's complicity in and unwillingness to address the lack of adequate internal and financial controls.  KPMG's resignation notice also revealed a host of other possible accounting issues:

[U]pon resignation, KPMG informed Company management and the Audit Committee that information related to the following matters came to its attention which, if investigated further, may (a) *materially impact the fairness or reliability of the financial statements as of and for the years ended December 31, 2013, 2012 and 2011 and the interim periods therein*, (b) *have caused KPMG to be unwilling to be associated with the Company's financial statements*, or (c) have prevented KPMG from rendering an unqualified opinion on the financial statements referred to above, and due to its resignation, KPMG did not conduct such further investigation:

• *Internal review of the accounting errors necessitating the restatements of the Company's 2012 and 2011 financial statements and the related underlying cause(s) of such errors*,

• *Revenue recognition related to the Company's emission control equipment contracts*,

• *Various accounting positions taken with respect to the Company's joint venture Clean Coal Solutions, LLC ("CCS")*,

• *Tax positions taken by the Company related to CCS' monetization of refined coal facilities*,

-103-

• *Appropriateness of purchase accounting related to the Company's acquisition in 2012 of the assets of Bulk Conveyor Specialist Inc. and Bulk Conveyor Services, Inc., including identification of intangible assets, determination of fair value and possible impairment of goodwill and related intangible assets*,

• *Appropriateness of accounting for stock-based compensation*,

• *Effectuation of the deconsolidation of CCS, which was determined by management to be appropriately accounted for as an equity method investment, as disclosed in the Company's Form 8-K dated November 20, 2014*, and

• *Multiple material weaknesses in internal controls over financial reporting not finally documented at the time of KPMG's resignation*.

In addition, KPMG expressed to management and the Audit Committee its concern that *there is an inappropriate tone at the top, discontent with the Company's timeliness and responsiveness to its requests for information and inability to determine whether management has made available all financial records and related data*. In giving the Company its resignation notice, *KPMG referenced the issues noted above and its inability to rely on management's representations*. (Emphasis added.)

130.    A little more than a week later, on February 6, 2015, KPMG sent a letter to the SEC clarifying that it had repeatedly discussed the aforementioned problems with management and the Audit Committee prior to its resignation, and that the Audit Committee requested external legal counsel to investigate the extent of the accounting wrongdoing, including the following:

4.  with respect to the first sentence in the sixth paragraph [referencing the other material weaknesses identified by KPMG and KPMG's unwillingness to be associated with the Company's financial statements, as provided *supra*, at ¶124], *the matters listed were also discussed with management and the Audit Committee on multiple occasions prior to our resignation*; and

-104-

5. with respect to the first bullet in the sixth paragraph [referencing internal review of accounting errors necessitating the restatements of the Company's 2012 and 2011 financial statements and the related underlying causes(s) of such errors, as provided *supra*, at ¶124], in addition to the internal review, ***the Audit Committee also requested the Company's external legal counsel to investigate the accounting errors necessitating the restatements and the related underlying cause(s) of such errors***.  (Emphasis added.)

131.    As detailed above, the initial March 13, 2014 disclosure only notified investors that there were accounting issues related to the EC segments with the Company's financial statements, but not the extent and severity of these issues.  The subsequent disclosures in the following months provided estimates as to the predicted adjustment necessary to make the previous financial reports true, and revealed that the EC accounting problems were not isolated to 2013.  The revelations culminated on January 29, 2015, when investors learned, as a result of KPMG's damning resignation, that the Company and its management had a pervasive culture of intentional fraud or, at a minimum, a severe and reckless disregard of internal and financial control requirements, as well as financial reporting requirements, and that Advanced Emissions likely would be required to disclose additional acts of accounting fraud and restate additional financial statements.

132.    The fact that the Company's management refused to effectively cooperate with KPMG during a period of almost a full year in which the Company was apparently struggling to complete the restatement of its previous financial statements to avoid being de-listed from the NASADAQ speaks volumes about the culture that existed within Advanced Emissions and the apparent, egregious disregard for financial

reporting and internal controls.

133.    KPMG's resignation also revealed that, as a result of the Company's attitude and apparent culture of non-compliance with respect to maintaining adequate financial controls, the Company's accounting in many other areas besides the EC segment was highly suspect and required further investigation.  It was only after KPMG's resignation that investors were provided with any notice of the potential extent and severity of the Company's false and misleading statements regarding its financial condition.  Yet, the exact overstatement of revenue and understatement of net loss is still indeterminate; over a year has passed since the Company was due to file its financial results for 2013, but the Company still has not filed those financial results or its restatements for the 2011-2013 fiscal years.  Moreover, although the Company has disclosed that it estimated an aggregate $10.8 million reduction in revenue and a $2.3 million increase in net loss for its 2013 financial results, it has not provided any estimates as to the expected adjustments to its 2011 and 2012 fiscal years or with respect to other false and misleading statements issued as a result of the other accounting issues flagged in KPMG's resignation.  Indeed, the Company has not released any of its financial results for any of its quarters in 2014 or 2015.

## VI.    ADDITIONAL FACTS SUPPLEMENTING THE STRONG AND COGENT INFERENCE OF SCIENTER

134.    The facts described above create an unmistakably strong and cogent inference of scienter by the Company, Durham, and McKinnies.  The damning nature of KPMG's strongly-worded resignation regarding the obstructive and cavalier attitude of

the Company's management towards rigorous financial reporting and internal controls creates an obvious and strong inference in and of itself.  Indeed, KPMG's resignation corroborates Hein's experience as the Company's auditor.  As discussed above, *supra* Section V.A., Hein, the Company's auditor for the fiscal years ended 2006 and 2007, was dismissed as a result of its conclusion -- for the fiscal year ended 2007 -- that the Company's internal controls for financial reporting suffered from material weaknesses and its disagreement with the Company's accounting treatment of an asset consolidation.  This history within ADES of repeatedly being required to admit deficiencies in internal, financial controls without any effective remediation of those issues speaks volumes about the Company's approach to candor and accuracy in its financial reporting.

135.   Moreover, the Company was already on notice from the 2012 Restatements that there was a strong likelihood of issues with its financial reporting and its aggressive approach toward accounting; nevertheless, the subsequent investigation purportedly made in response to the 2012 Restatements failed to report the EC Revenue Misrepresentations.  And, of course, the fact that the Company has been unable to complete the restatement of its financial results for its fiscal year ended December 31, 2013, much less revised results for its fiscal years ended December 31, 2012, and December 31, 2011 -- even in the face of being de-listed from the NASDAQ and after missing multiple deadlines, whether self-imposed or otherwise -- is highly suspicious and the only logical inference is that these severe accounting issues are the

result of intentional fraud.  Indeed, this utter and continuing inability to rectify these

accounting issues confirms the severity of the Company's accounting and financial

problems, as well as ADES' lack of adequate internal controls, which only could have

deteriorated to such a degree and been permitted to continue over a sustained period

of time as a result of intentional misbehavior or stunning recklessness by the Company

and the other Defendants.

136.   The turnover at the top of the Company -- over the past year during this

period of corrective (but limited) disclosures -- also supports a finding of scienter.  The

Company's apparent (albeit belated) attempt to "clean house" demonstrates the

severity of the problems regarding the lack of reliable financial controls and the

culpability of those who were charged with managing and overseeing the financial

controls within the Company.

137.   On April 24, 2014, in the same release stating that its 2013 financial

reports could not be relied upon, the Company announced that it had appointed Smith

as its Chief Accounting Officer (who now has left ADES), despite the fact that

McKinnies was already serving as the Company's CFO and Principal Accounting Officer

at that time.  On May 27, 2014, the Company appointed Taylor Simonton ("Simonton")

as an independent director and Chairman of the Audit Committee in place of A. Bradley

Gabbard.  Simonton is, among other things, the Lead Director, Chair of the Audit

Committee of Keating Capital, a business development and close-end mutual fund.

Meanwhile, Richard Swanson, a member of the Audit Committee and former Chairman

of the Audit Committee from July 2006 to June 2014, resigned on June 6, 2014. McKinnies, who had presided as CFO over the 2012 Restatements and now the EC Revenue Misrepresentations, resigned on September 2, 2014.  This was followed by the resignation of Bustard, the COO, on September 19, 2014, and, as noted above, the replacement of Durham in April, 2015.

138.   Interviews of the Company's former employees bolster the strong inference of scienter in a manner that creates the conclusion that the false and misleading statements were the result of fraudulent intent and/or severe recklessness virtually undeniable.  These confidential witnesses confirm management's cavalier attitude toward accurate accounting and strong financial controls, which permeated the Company from top to bottom, in a manner such that concerns or issues regarding accurate accounting by project managers were consistently ignored.

139.   Confidential Witness One ("CW1") is an individual who worked during the Class Period as a Project Manager ("PM") for BCSI, LLC ("BCSI") p/k/a Bulk Conveyor Specialist Inc. and Bulk Conveyor Services, Inc., one of the Company's key subsidiaries that contributed to its EC business segment and which was expected to contribute over $100 million in revenues in the three years following its acquisition by the Company in July, 2012.  CW1 was employed as a PM at BCSI at its location in Pennsylvania from August, 2013 through August, 2014, and, in this role, CW1 reported directly to the President of BCSI -- who first was Bill Caputo ("Caputo") (an individual who had founded BCSI and subsequently sold it to ADES in July, 2012) and later was Randy

Gounder ("Gounder")(who replaced Caputo as President of BCSI in March, 2014).[4]  In his role as a PM, CW1 would monitor projects, costs, forecasting, review job sites, and perform other functions with the goal of ensuring that projects were timely and effectively completed within budget.  According to CW1, as part of the Company, BCSI's accounting department was chronically understaffed and labor hours -- the method used for measuring the EC Contracts' revenue -- were, at best, haphazardly recorded.  Specifically, CW1 explained that BCSI had only two staff members in its accounting department, and were dealing with a very difficult situation with the main accountant overwhelmed with the type and amount of work expected of her.  The primary accountant at BCSI reported directly to the President, Gounder, and later reported to BCSI Controller, Mike Podnar.

140.    As a PM, CW1 was, among other things, responsible for forecasting and tracking the amount of labor hours expended on a project.  But, according to CW1, information regarding work-hours expended on projects was frequently unavailable or missing, and there was no system of any kind in place at ADES to accurately track, allocate, or report labor hours according to project.  Given the difficulty of obtaining the information and the distraction from his primary duties pertaining to ensuring project progression and deadlines, CW1, like other PMs, were frequently required to estimate labor hours by essentially guessing with respect to the amount of labor hours

---

[4]CW1 related that Caputo initiated legal proceedings against the Company and/or BCSI based on issues regarding how Advanced Emissions ran BCSI after he sold BCSI to the Company.

expended.  Although CW1 brought these issues to the attention of BCSI's President, no changes were made.  Indeed, according to CW1, accurately forecasting and recording labor hours simply was not a priority within the Company.  Rather, at BCSI, management only cared about predicting cash flows to maintain its operations.

141.   CW1 also explained that obtaining reports relating to project costs or labor hours was difficult at the Company.  Simply put, this information was not readily available to him or others at BCSI.  In response to these difficulties, CW1 created his own spreadsheet to try to track and forecast labor and costs on the projects for which CW1 was responsible.  However, this proved to be very challenging because the information CW1 had to work with (such as worker time-sheets), was often not accurate and, at times, was not readily available.  CW1 stated that the Company's primary goal was to complete construction of projects and meet delivery dates and, therefore, there was not a particular focus or concern on tracking costs or labor hours.  Since labor was a key metric used with respect to revenue recognition at the Company (albeit incorrectly from an accounting perspective), the lack of internal and financial controls existing and obvious to anyone responsible for monitoring financial reporting and the adequacy of internal controls, including Durham and McKinnies.

142.   CW1 did regularly receive reports from ADES headquarters in Colorado relating to labor and costs, but the information was inaccurate.  CW1 explained that these reports did not have proper "logging in per job" data, or per work item information, or per task data.  CW1 believed the corporate reports from ADES in Colorado were

mostly "guesstimates" and CW1 was unable to reconcile the information contained in these corporate reports with the excel spreadsheets that CW1 maintained in an effort to track such information of his own accord.

143.    CW1 worked with another PM, Ron Hanson ("Hanson"), who was based in Colorado.  CW1 noted that Hanson also struggled to adequately track costs and labor for his projects.  CW1 understood that Hanson had the same problems that CW1 experienced in terms of gathering accurate information and tracking or allocating labor hours and other costs on a project basis.  According to CW1, like BCSI, ADES similarly had no means or system to accurately track, allocate or report labor hours or other costs.  It was CW1's understanding that, after ADES acquired BCSI, internal controls and the ability to accurately forecast or track costs had become more "relaxed."

144.    CW1 was required to generate a monthly forecasting report which required CW1 to first review invoices and determine "what had been spent, what was yet to be spent, spread that out across the life of the project, and then try and estimate the man hours throughout."  CW1 noted that all the above information was based on a "best guess" and that the process was a "mess" because the necessary information was not available or timely provided.  Both CW1 and the other PM at BCSI were estimating project cost data based on the estimated cost of the job because "the information was so incomplete" and the PMs did not have access to accurate cost information related to projects -- just as in the case of the incomplete labor cost information available to them.  CW1 explained that creating and reviewing these reports

took up so much of time every month as a result of the lack of readily available information that it was difficult to get CW1's primary work done.  CW1 raised these issues with Gounder, the President of BCSI, but according to CW1, nothing came of it.  By the time CW1 left BCSI in August, 2014, preparing forecasting reports bordered on the laughable because of the lack of reliable information available to CW1.

145.    According to CW1, BCSI did not put a priority on recording and logging labor hours or even tracking equipment used for projects.  At other companies where CW1 had been employed, an Enterprise Resource Planning ("ERP") management information system was used, but no such system was in place at BCSI (at least as of when CW1 left employment with BCSI in August, 2014).  CW1 did understand that BCSI's President, Gounder, and possibly Smith, the Company's Chief Accounting Officer, were involved in selecting an ERP system to eventually put into place at BCSI.  CW1 explained that, at BCSI, there was no real time keeping system, the accounting function was performed by one primary employee and there was no assignment of costs per job.  Rather, personnel at BCSI simply spent money and were happy when there was money left over.  To the extent any project-based accounting was performed at BCSI, CW1 recalled that such accounting was performed by one employee, using an Excel spreadsheet.

146.    In sum, CW1 describes a system of accounting, financial reporting and internal controls at BCSI that was in shambles and that would have been obvious to anyone at ADES, including Durham and McKinnies, who bothered to evaluate such

issues.

147.    Confidential Witness Two ("CW2"), a former Accounts Payable

Specialist/Payroll Processor and member of the accounting department, ADA-ES, Inc.

("ADA-ES"), one of the Company's operating subsidiaries, was employed during the

Class Period, from April, 2014 to July, 2014, in Colorado and reported to Accounting

Manager, Diana Rodriguez.  CW2 confirmed that the accounting department in which

CW2 worked was consistently understaffed and overwhelmed with unrealistic

expectations imposed by management.  CW2 left ADA-ES after approximately four

months in light of this difficult work environment.

148.    The Company and its management, including Durham and McKinnies,

knew or recklessly ignored the inaccuracy and self-serving nature of recognizing

revenue by labor-hours, based on the business model of the Company.  Confidential

Witness Three ("CW3") is an individual who worked during the Class Period as a PM for

ADA-ES between July, 2013 and July, 2014, after it was reorganized into a subsidiary

of Advanced Emissions.  CW3 explained that EC Contracts were generally labor-

intensive at the beginning because of the engineering and design work performed by

the Company's employees and the fact that fabrication and installation work thereafter

was conducted by various vendors/subcontractors, which would not be included as

labor costs.  Thus, by utilizing completed labor hours based upon total estimated labor

hours, the Company and its management, including Durham and McKinnies, knew or,

at the very minimum, recklessly disregarded the fact that they were front-loading the

recognition of revenue relative to the actual stage of project completion.

149.   Confidential Witness Four ("CW4"), an individual who was employed by ADA-ES before and during the Class Period from August, 2008 until November, 2013 as a Finance Director and Controller, reported directly to McKinnies and/or Bustard. CW4 explained that the structure of the EC Contracts meant that the Company's methodology of recognizing revenue based on percentage of labor hours expended over the projected labor hours necessary for a project was susceptible to earlier revenue recognition (and CW4 emphasized that this method was used consistently at the Company).  As CW4 illustrated, if a project has 1,000 hours budgeted for engineering labor and 100 hours of labor had been expended in a month, then the Company regards the project as 10% complete.  This means that 10% of the revenue from the project is booked regardless of how much money had actually been invoiced or received at that point and regardless of the actual completion rate of the project from an overall cost point of view or otherwise.

150.   CW4 had regular and direct contact with both Bustard and McKinnies, each of whom participated in monthly project review meetings in which forecasts were made with respect to labor and costs required for projects, and actual costs incurred were compared to previous forecasts.  CW4 and other senior managers recognized, as early as 2009, the necessity for the Company to acquire project management software and other systems to ensure more accurate reporting of project progress by the project managers.  The Company, however, did not begin implementing that software until

2011 and, as CW1 explained above, the implementation of such software was far from complete during the Class Period.

151.    Confidential Witness Five ("CW5") and Confidential Witness Six ("CW6"), each worked in the accounting functions within Advanced Emissions in Colorado in senior roles for approximately two years (from May, 2011 until April, 2013 and September, 2010 until October, 2012, respectively), and each confirmed that they were consistently challenged due generally to ineffective systems/internal controls, incompetent accounting personnel, and unrealistic demands from senior staff.

152.    According to the Company's 2012 10-K, ADES has a total number of approximately 175 employees, including part-time employees, even when employees of its operating subsidiaries are included.  Given the small size of the Company, it defies credulity that the Company's senior management, including the Individual Defendants, were unaware of the reckless accounting and financial reporting approaches being utilized within the Company and the severe deficiencies in the Company's internal controls persistent throughout the enterprise, unless they were willfully or recklessly turning a blind eye to the realities within Advanced Emissions.

153.    A strong inference of scienter also exists in this case because each and every disclosure the Company made, including those regarding the EC Revenue Misrepresentations, as well as the prior disclosures regarding its lack of adequate financial controls, were only made after the Company and its management were forced to do so by third parties.  The accounting errors reported in its Form 10-Q quarterly

report filed on August 9, 2012, and the resulting the 2012 Restatements arising from the Company's treatment of its equity investment in Clean Coal, were only disclosed at the behest of the SEC.  CW4 explained that, despite the SEC's demands, the Company's senior executives were resistant to any change.  The Company's senior executives only relented when the SEC informed the Company that it would not accept any filings for financial reports if the objection was not remedied.  Indeed, CW4 explained that, based on his experience while at the Company, management would only concede to making the disclosures regarding the EC Revenue Misrepresentations if required to do so by KPMG, and KPMG only had such leverage because keeping KPMG was necessary for the Company to obtain more legitimacy in the market to secure further funding.  But, apparently, the desire for such legitimacy (as well as the desire for Advanced Emissions to maintain its legitimacy by having ADES stock continue to be listed on the NASDAQ), was outweighed by the realities of the Company's management being fulsome and timely in response to requests for information from KPMG, and the realities of the actual work required to remedy its financial reporting and internal control system deficiencies, as well as to correct its previously filed false and misleading financial statements.

154.    Together, the public facts and the information obtained from confidential witnesses establish that the Company and its management, including the Individual Defendants, had, during the Class Period, and indeed, still have, little to no regard for ensuring sufficient, truthful and fulsome financial reporting and controls unless actually

pressured and threatened by external parties.  Despite the Company's claim that it had "re-evaluated the operational effectiveness of [their] internal controls over financial reporting" in August, 2012 after the SEC demanded that it file the 2012 Restatements, any such investigation was apparently superficial at best, which explains why the EC Revenue Misrepresentations were never disclosed until KPMG discovered the issue and compelled the Company in March, 2014 to advise the investing public that certain financial statements previously filed with the SEC were false and misleading.

155.    In the aftermath of this disclosure, the Company appears to have dismissed certain responsible personnel, including McKinnies.  But even then, and in the face of a threatened de-listing from the NASDAQ, the Company's commitment to ensure robust and reliable financial controls and reporting was, at best, limited in nature.  In the end, as disclosed by KPMG's withdrawal as the Company's auditor and its disclosure that there remained within Advanced Emissions an "inappropriate tone at the top," and problems with "the Company's timeliness and responsiveness to [KPMG]'s requests for information," coupled with its "inability to determine whether management has made available all financial records and related data" or to "rely on management's representations," speaks volumes about the Company's true commitment (or lack thereof) to honest and forthright communication of financial results and with respect to the status of internal operations to the investing public.

156.    At all pertinent times, Durham and McKinnies, as well as other senior executives at the Company, including the other Individual Defendants, had the

compelling motive to artificially inflate the value of ADES stock because their incentive compensation was tied, in part, to the Company's share price, this incentive compensation often included stock awards and total incentive compensation often amounted to 50% or more of an executive's total compensation in a given year. Durham and McKinnies each also disposed of a significant portion of their pre-Class Period shares of ADES stock during the Class Period, with Durham gifting and selling over 15% of his shares and McKinnies gifting and selling almost 25% of his shares.

157.   Accordingly, the facts establish that, at all pertinent times, the Company, Durham, and McKinnies acted with the requisite scienter to support the claims asserted herein for violations of the federal securities laws.

## VII.   LOSS CAUSATION

158.   The market for ADES common stock was open, well-developed, and efficient at all relevant times.  During the Class Period, as detailed herein, Advanced Emissions, Durham, and McKinnies engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of ADES common stock and operated as a fraud or deceit on Class Period purchasers of ADES shares, by failing to disclose or misrepresenting that: (1) the Company had applied an improper methodology to recognize revenue on its EC Contracts, which resulted in revenue being prematurely recognized by the Company and which fact was apparent to the Company's senior management, based upon the business operations of Advanced Emissions, and made material errors in the accrual of revenues; (2) as a result, the

Company's reported revenues and financial results were overstated; (3) as such, the Company's financial statements were not prepared in accordance with GAAP; (4) the Company lacked adequate internal and financial controls, which rendered its financial statements inherently unreliable; (5) the Company's accounting, internal control and financial reporting systems and functions were disorganized, technologically deficient, understaffed and effectively in a shambles, thereby rendering its financial reporting and statements inherently unreliable and highly suspect, and these facts were known to senior management, including Durham and McKinnies, or, at a minimum, were recklessly disregarded and willfully ignored by these Defendants; and (6) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

159.    As a result of the materially false and misleading statements and material omissions as alleged herein, ADES common stock traded at artificially inflated prices during the Class Period, reaching a high of $29 per share on November 29, 2013.

160.    Lead Plaintiff and the Class purchased or otherwise acquired ADES common stock relying upon market information relating to ADES and the integrity of the market price of ADES common stock, thus suffering economic loss and the damages complained of herein when the truth and/or the effects thereof was completely revealed and the artificial inflation was removed from the price of ADES common stock.

161.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

162.    But for the misrepresentations and omissions alleged herein, Lead Plaintiff and the other members of the Class would not have purchased ADES common stock at the artificially inflated prices at which they were purchased.

163.    On March 13, 2014, as described in further detail above, *supra* Section V.C., the Company issued a press release announcing that it would be rescheduling its 2013 fourth quarter and year-end news release and conference call because of issues related to overstating the revenues and margins of the EC segment.  As described above, the press release did not offer any estimates as to the severity of the overstatement and was limited to its financial results for 2013.  As a direct result of that limited disclosure and as the market began absorbing the information, the Company's share price began dropping, falling from $27.11 per share to $25.45 on March 13, 2014, a 6.14% decline, on unusually heavy volume of 569,600 shares compared to a volume of 204,000 shares the prior day.

164.    On March 18, 2014, as described in further detail above, *supra* Section V.C., the Company filed its notice of late filing with the SEC and issued a prediction that it would reduce revenues by $9 million and increase net losses by $2 million in the aggregate for the first three quarters of 2013.  On that news, the Company's share price fell from $25.50 to $24.50 the next day, followed by a further decline to $23.73, a 5.83% decline from the March 18, 2014 share price and a 12.48% decline from the March 13, 2014 share price.  By April 24, 2014, the share price closed at $22.94, a 15.40% decline from the March 13, 2014 share price.

165.    As described in further detail above, *supra* Section V.C., on April 24, 2014, the Company filed a notification of non-reliance with respect to its financial statements for the first three quarters of 2013 and expanded the previous estimate of reduction in revenue to $10.8 million and increase in net loss to $2.3 million.  In the weeks that followed, the share price declined to a low of $18.10 per share, which was a 21.1% decline from its share price on April 24, 2014, and a 33.25% drop from its share price on March 13, 2014.  There was no other substantial news regarding the Company during this time period from April 24, 2014 to May 15, 2014.

166.    On August 21, 2014, the Company issued a press release announcing that its Audit Committee had concluded that the Company's accounting misrepresentations expanded beyond 2013, and that the annual and quarterly financial statements for the years ended December 31, 2011 and 2012, as previously issued, also could not be relied upon because the statements suffered from the same revenue recognition issues as the 2013 quarterly statements (*i.e.*, the EC Revenue Misrepresentations).  As a result, the share price of ADES stock fell in excess of an additional 7% on unusual trading volume from a close of $22.65 on August 20, 2014 to a close of $21.00 on August 21, 2014.

167.    In the following months, the Company's share price stabilized at a range of approximately $19 to $24 per share, until, on January 29, 2015, the Company revealed after the market closed that KPMG had resigned as its auditor in an apparent protest and frustration over management's complicity in and unwillingness to address

the lack of adequate internal and financial controls, as well as severe accounting and financial problems existing and persisting at the Company, as described in further detail above.  The following day, the share price of ADES collapsed, closing at $10.61, a 46.44% drop from its previous day's share price of $19.81.  The share price fell even further the next market day, closing at $9.40 per share, a 52.55% drop from its share price on January 29, 2015.  Volume was even more unusually heavy, going from 61,700 shares on January 29, 2015, to 2 million shares on January 30, 2015, and then to 6.4 million shares on February 2, 2015.  Seeking Alpha, an investment website, reported on January 30, 2015, in part, as follows:

- Shares of Advanced Emissions Solutions (ADES -47.7%) are nearly cut in half after the developer of clean coal technology said late yesterday that KPMG had resigned as its accounting firm.

- ADES says it is seeking a new accountant but expects to have its shares de-listed from the Nasdaq because it does not believe it can make the required financial filings and regain compliance.

- Cowen analyst Jeff Osborne downgrades share to Market Perform, saying that "*while we believe the company has compelling technology solutions, lack of transparency in financial statements*" and ongoing accounting issues "*gives us pause*."

http://seekingalpha.com/news/2261456-advanced-emissions-crushed-after-accounting-firm-resigns (emphasis added.)

168.    All in all, from March 12, 2014, to February 2, 2015, the Company's share price fell from $27.11 to $9.40, a 65.33% decline.  The price decreases during this time period were the results of the widening disclosure of facts that had previously been concealed and/or misrepresented by the Company, Durham and McKinnies, and which

had artificially inflated the share price of ADES.  The price decreases cannot be attributed either to general market or industry-wide events.

169.   In contrast to the sharp decline in ADES' share price during the period from March 12, 2014 to February 2, 2015, the general and industry stock markets were steadily expanding.  The NASDAQ index rose from 4,260.42 on March 12, 2014, to 4,676.69 on February 2, 2015, an 8.17% increase.  Meanwhile, the value of the NASDAQ US Benchmark Waste & Disposal Services Total Return Index, which is a composite of ADES' sector, rose from 1,254.37 on March 12, 2014, to 1,447.53 on February 2, 2015, a 15.4% increase.

170.   Although ADES' share price has recovered some of its value since February 2, 2015, it has never traded above $18 per share, which is a 9.14% difference from its $19.81 closing share price on January 29, 2015 – the market day immediately before news of KPMG's resignation became public – and a 33.6% difference from its $27.11 share price on March 12, 2014, the market day preceding ADES' first disclosure regarding its accounting problems.

171.   As a result, members of the Class who purchased ADES common shares during the Class Period and continued to hold those shares after the Class Period's corrective disclosures have sustained economic injury resulting from the decline in value from the revelations on and between March 13, 2014, and January 29, 2015. Members of the Class who purchased ADES common stock during the Class Period and sold those shares after the initial disclosure on March 13, 2014, through the end of

the Class Period on January 29, 2015, have suffered economic injury caused by the

misrepresentations and/or omissions during the Class Period that remained

undisclosed until January 29, 2015 (and may remain partially undisclosed with respect

to their severity in light of the continued failure by Defendants to correct their previous,

false financial statements or file new financial statements).

172.    The damages suffered by Lead Plaintiff and other members of the Class

were the direct and proximate result of Defendants' fraudulent scheme to artificially

inflate the price of ADES common stock, the disclosures of which caused the

subsequent, significant declines in value as the share price returned to its true value.

173.    The foregoing allegations describe Lead Plaintiff's theory of damages,

demonstrate that Lead Plaintiff's damages were caused by the scheme to defraud as

alleged herein, and negate any inference that Lead Plaintiff and the Class' losses were

the result of general market conditions or other factors wholly unrelated to the false and

misleading information complained of herein.

## VIII.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

174.    The presumption of reliance established by the fraud-on-the-market

doctrine applies to this action.

175.    At all relevant times, the market for ADES common stock was efficient for,

among other things, the following reasons:

        a.    ADES common stock met the requirements for listing, and was
listed and actively traded on NASDAQ, a highly efficient and
technologically advanced equities market, prior to and during the

Class Period;

b.   As a regulated issuer, Advanced Emissions filed periodic public reports with the SEC;

c.   Advanced Emissions regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services, and participated in open conference calls with stock analysts and investors;

d.   According the Company's most recent Form 10-Q, which was filed with the SEC on November 12, 2013, as of October, 31, 2013, there were 10,116,719 shares of ADES common stock outstanding, and according to the Schedule 13G filed with the SEC on February 4, 2015, 1,204,264 shares of ADES common stock represented 5.54% of the outstanding shares, which means there were 24,085,280 shares outstanding as of February 4, 2015;

e.   The trading volume of ADES common shares was substantial during the Class Period, averaging approximately 175,000 shares traded per day from July 1, 2013;[5]

f.   Advanced Emissions was covered by various securities analysts, who wrote reports which were available through various automated data retrieval services; and

g.   The market price of ADES common shares reacted rapidly to new information entering the market.

176.   As demonstrated herein, there are empirical facts showing causation between corporate events or releases and an immediate response in the price of ADES common stock.

177.   As a result of the foregoing, the market for ADES common stock promptly

---

[5]This is the earliest data currently and readily available from the NASDAQ.

digested current information regarding ADES from all publicly available sources and reflected such information in ADES stock prices.

178.    Lead Plaintiff and all other members of the Class purchased shares of ADES common stock at prices set by the market and did so in reliance on the integrity of those prices.  Under these circumstances, all purchasers of ADES common stock during the Class Period suffered similar injury through their purchase of ADES common stock at artificially inflated prices and, thus, a presumption of reliance applies.

## IX.    INAPPLICABILITY OF THE SAFE HARBOR

179.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pled herein because the specific statements pled herein were neither identified as "forward-looking statements" when made, nor accompanied by meaningful, cautionary language identifying important factors that could cause actual results to differ materially from those in the specific statements.  To the extent that the statutory safe harbor applies to any of the statements pled herein, Defendants are liable for those statements because, at the time each of those forward-looking statements was made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was made by or with the approval of an executive officer of the Company, who knew that the statement was false and/or misleading when made.

## X.    CLASS ACTION ALLEGATIONS

180.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of

the Federal Rules of Civil Procedure on behalf of all persons who purchased ADES

common stock during the Class Period (the "Class").  Excluded from the Class are

Defendants, directors and officers and other employees of Advanced Emissions, their

families and affiliates, any entities in which any of the Defendants have a controlling

interest, the legal representatives, heirs, successors, predecessors in interest, affiliates

or assigns of any of the Defendants, and the Judge(s) to whom this case is assigned.

181.   This action may properly be maintained as a class action as a result of the

following facts:

a.      During the Class Period, millions of shares of ADES common stock

were issued and outstanding and were actively traded on the NASDAQ, a liquid,

efficient and impersonal trading market.  The members of the Class for whose benefit

this action is brought are located throughout the United States, and are so numerous

that joinder of all members of the putative Class is impracticable.  Millions of ADES

shares were publicly traded during the Class Period and, upon information and belief,

there are hundreds or thousands of members of the Class;

b.      Lead Plaintiff's claims are typical of the claims of the other

members of the Class, and Lead Plaintiff and all members of the Class sustained

damages as a result of Defendants' wrongful conduct complained of herein;

c.      Lead Plaintiff is a representative party that will fairly and adequately

protect the interests of the other members of the Class, and has retained counsel

competent and experienced in class action securities litigation.  Lead Plaintiff has

conducted an extensive investigation in support of this action and has interviewed numerous former ADES employees, who have confirmed the securities fraud committed by Defendants.  Lead Plaintiff has no interests antagonistic to, or in conflict with, the Class it seeks to represent;

d.      A class action is superior to all other available methods for the fair and efficient adjudication of the claims asserted herein, because joinder of all members is impracticable.  Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to separately redress the wrongs done to them.  The likelihood of individual Class members prosecuting separate claims is remote;

e.      Lead Plaintiff anticipates no unusual difficulties in the management of this action as a class action; and

f.      The questions of law and fact common to the members of the Class predominate over any questions affecting any individual members of the Class.

182.    The questions of law and fact which are common to the Class include, among others:

a.      Whether the federal securities laws were violated by the Defendants' acts as alleged in this Complaint;

b.      Whether the documents, press releases, reports and/or statements disseminated to the investing public and to ADES shareholders during the Class Period

omitted and/or misrepresented material facts about the financial condition, business prospects of Advanced Emissions, including that: (1) the Company had applied an improper methodology to recognize revenue on its EC Contracts, which resulted in revenue being prematurely recognized by the Company and which fact was apparent to the Company's senior management, based upon the business operations of Advanced Emissions, and made material errors in the accrual of revenues; (2) as a result, the Company's reported revenues and financial results were overstated; (3) as such, the Company's financial statements were not prepared in accordance with GAAP; (4) the Company lacked adequate internal and financial controls, which rendered the Company's financial statements inherently unreliable; (5) the Company's accounting, internal control and financial reporting systems and functions were disorganized, technologically deficient, understaffed and effectively in a shambles, thereby rendering its financial reporting and statements inherently unreliable and highly suspect, and these facts were known to senior management, including Durham and McKinnies, or, at a minimum, were recklessly disregarded and willfully ignored by these Defendants; and (6) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

      c.     Whether Defendants failed to correct previously issued statements that they knew to be false or they recklessly disregarded the truth or falsity of such statements;

      d.     Whether Defendants failed to disclose material, adverse

information at a time when they were in possession of such information;

e.      Whether Defendants acted with knowledge or reckless disregard for the truth in misrepresenting and omitting material facts;

f.      Whether, during the Class Period, the market price of ADES common stock and other securities was artificially inflated due to the material misrepresentations and omissions complained of herein;

g.      Whether Defendants participated in and pursued the common course of conduct complained of herein; and

h.      Whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

## COUNT I

### (For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against Advanced Emissions, Durham, and McKinnies)

183.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against Advanced Emissions, Durham, and McKinnies.

184.    During the Class Period, Advanced Emissions, Durham, and McKinnies, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of ADES common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase ADES stock at artificially inflated

prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

185.   Advanced Emissions, Durham, and McKinnies: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for ADES securities in violation of §10(b) of the Exchange Act and Rule 10b-5.  Advanced Emissions, Durham, and McKinnies are sued as primary participants in the wrongful and illegal conduct alleged herein.  The Individual Defendants also are sued herein as controlling persons of Advanced Emissions, as alleged herein.

186.   In addition to the duties of full disclosure imposed on Advanced Emissions, Durham, and McKinnies, as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.1, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market price of the Company's publicly

traded securities would be based on truthful, complete and accurate information.

187.   Advanced Emissions, Durham, and McKinnies, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse, material information about the business, business practices, performance, operations and future prospects of Advanced Emissions, as specified herein.  Advanced Emissions, Durham, and McKinnies employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Advanced Emissions' value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Advanced Emissions and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of ADES securities during the Class Period.

188.   Durham and McKinnies' primary liability, and controlling person liability, arises from the following facts: (i) each of the them was a high-level executive and/or director at the Company during the Class Period; (ii) each of them, by virtue of his responsibilities and activities as a senior executive officer and/or director of the

Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) each of them enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of them was aware of the Company's dissemination of information to the investing public which they knew, or recklessly disregarded, was materially false and misleading.

189.   Advanced Emissions, Durham, and McKinnies had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.  Advanced Emissions, Durham, and McKinnies' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Advanced Emissions' operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, Durham and McKinnies, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge and/or deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

190.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of ADES securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Advanced Emissions' shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Advanced Emissions, Durham, and McKinnies, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Advanced Emissions, Durham, and McKinnies, but not disclosed in public statements by them during the Class Period, Lead Plaintiff and the other members of the Class purchased or otherwise acquired ADES securities during the Class Period at artificially inflated high prices and were damaged thereby.

191.    At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of ADES, which were not disclosed by Advanced Emissions, Durham, and McKinnies, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired ADES securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

192.    By virtue of the foregoing, Advanced Emissions, Durham, and McKinnies

each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

193.    As a direct and proximate result of Advanced Emissions, Durham, and McKinnies' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### (For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

194.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against Durham, McKinnies, Bustard, Sjostrom, Amrhein and Sampson.

195.    The Individual Defendants were and acted as controlling persons of Advanced Emissions within the meaning of § 20(a) of the Exchange Act, as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends were false and misleading, as well as the failure to correct previously issued statements that were false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to

be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

196.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

197.    Both Durham and McKinnies participated directly in each and every one of the false and misleading statements and material omissions at issue in this case and did so with apparent culpability, based upon their positions, knowledge and Class Period statements and omissions.  But all Individual Defendants, as explained herein, knowingly and substantially participated in the wrongdoing at issue and/or failed to act with the apparent intent to further the fraud at issue or prevent its discovery.

198.    As set forth above, Advanced Emissions, Durham, and McKinnies each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, Lead Plaintiff, on behalf of itself and the other members of the Class, demands judgment against Defendants as follows:

a.      Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.      Certifying Lead Plaintiff as the Class Representative and its counsel as Lead Class Counsel;

c.      Declaring and determining that Defendants violated the federal securities laws by reason of their conduct as alleged herein;

d.      Awarding monetary damages against all of the Defendants;

e.      Awarding Lead Plaintiff the costs, expenses, and disbursements incurred in prosecuting this action, including reasonable attorneys' fees and other recoverable expenses of litigation; and

f.      Awarding Lead Plaintiff and the other members of the Class such other and further relief as the Court may deem appropriate and just under all of the circumstances.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Lead Plaintiff

demands a trial by jury in this action for all claims so triable against all Defendants.

Dated: April 20, 2015

/s/ James E. Miller
James E. Miller
Laurie Rubinow
SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
Email: jmiller@sfmslaw.com
        lrubinow@sfmslaw.com

Nathan Zipperian
SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
1640 Town Center Circle, Suite 216
Weston, FL 33326
Telephone: (954) 515-0123
Facsimile: (866) 300-7367
Email: nzipperian@sfmslaw.com

Rose F. Luzon
Kolin C. Tang
Valerie L. Chang
SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
401 West A Street, Suite 2350
San Diego, CA 92101
Telephone: (619) 235-2416
Facsimile: (866) 300-7367
Email: rluzon@sfmslaw.com
        ktang@sfmslaw.com
        vchang@sfmslaw.com

David W. Edgar (Bar No. 41956)
EDGAR LAW FIRM, LLC
The Spectrum Building
1580 Lincoln Street, Ste. 1100
Denver, CO 80203
Tel: (720) 529-0505
Facsimile: (303) 486-0001
Email: dwe@edgarlawfirm.com

**Attorneys for Lead Plaintiff,
The United Food and Commercial Workers Union
and Participating Food Industry Employers Tri-
State Pension Fund**

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 20, 2015, a true and correct copy of the foregoing

has been electronically filed with the Clerk of the Court using the CM/ECF system and

that such filing will accomplish service upon all counsel of record.


/s/ James E. Miller
James E. Miller
SHEPHERD FINKELMAN MILLER
 & SHAH, LLP
Email: jmiller@sfmslaw.com